**SAFE HARBOR WATER POWER CORPORATION**

v.

**The UNITED STATES.**
No. 446-60.

United States Court of Claims.
June 6, 1962.

David W. Richmond, Washington, D. C., for plaintiff. John S. Nolan, James F. Gordy, Miller & Chevalier, Washington, D. C., and Clyde T. Warren, Baltimore, Md., were on the briefs.

Cynthia Holcomb, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant. Edward S. Smith and Philip R. Miller, Washington, D. C., were on the brief.

DURFEE, Judge.

This is a suit for recovery of income taxes for the calendar years 1954, 1955 and 1956 in the aggregate amount of approximately $752,500.00.

The facts were stipulated in the memorandum of pretrial conference filed by the Trial Commissioner in his report to the court. [See Rule 28, 28 U.S.C.A.] Plaintiff owns and operates a hydroelectric power plant at Safe Harbor, Pennsylvania. Plaintiff's entire capital stock is presently, and has been since 1931, owned two-thirds by Consolidated Gas Electric Light and Power Company of Baltimore (name changed in 1955 to Baltimore Gas and Electric Company) and one-third by Pennsylvania Water and Power Company (merged into Pennsylvania Power & Light Company in 1955). Plaintiff's entire output of electrical energy is and has been since 1931 sold to these two stockholders in proportion to the stock owned by each, pursuant to a contract and a tariff approved by the Federal Power Commission. The contract and tariff required payment by the two customers to plaintiff in such annual amount as was required to yield to plaintiff Safe Harbor Company a net income of five percent, after all reasonable operating expenses, insurance, taxes and reasonable allowance for depreciation, on its accumulated actual investment in the initial development, without regard to the amount of power actually furnished.

From 1923 to 1952 it was the policy of the Commissioner of Internal Revenue to include in taxpayer's income *only the initial income tax* paid by customers on behalf of taxpayers. This policy was reiterated by the Commissioner in a letter to plaintiff dated December 17, 1941 which stated in part as follows:

"It is well established that the payment of a tax by a person other than the taxpayer constitutes income to the taxpayer in whose behalf the tax is paid. In such cases it is the practice of the Bureau to include such payment as additional income to the person on whose behalf the payment is made, *but beyond that point the Bureau will not pyramid liability.* Accordingly, in the case you submit there should be but one addition to the income of the Safe Harbor Water Power Corporation by reason of the taxes paid on its behalf by Consolidated Gas Electric Light and Power Company of Baltimore." (Emphasis supplied).

In 1952 the Internal Revenue Service changed this policy and published instructions referred to as Mimeograph 6779 and Mimeograph 51. Mimeograph 6779 stated in part:

"Under a contract providing for payment to the lessor of a stipulated rental and any Federal income taxes thereon, the lessor is deemed to have received as rental income not only the stipulated rental, but in addition thereto all Federal income taxes paid by the lessee to, or for the account of, the lessor. * * * The Bureau will not concern itself with the mechanics used by the respective parties in determining the extent of the lessee's liability so long as the lessor includes in gross income the total amount of Federal income taxes paid by the lessee."

Mimeograph 51 provided that the above ruling was likewise applicable to other types of income payments in addition to those under lease agreements.

For the calendar years 1954, 1955 and 1956 involved in this case, plaintiff computed its taxable income by including in gross income an amount equal to *the total federal income tax reimbursements* which it charged to its two customers as a part of the cost of power, under the contract and tariff. This computation was made, and the customers were billed in advance of actual payment. For example, the advance computation and reimbursement of federal income taxes includable in the power bill for 1954 (January 13, 1955) was as follows:

FEDERAL INCOME TAX

| | | |
|---|---|---|
| 5% Return on FPC Rate Base .................... | | $1,291,832.58 |
| Deductions: | | |
|     Interest on Long-Term Debt Bonds ....$420,000.00 | | |
|     Interest on Long-Term Debt Note ..... 23,187.50 | | |
|     Debt Premium and Expense ..........($22,314.80) | | |
|     Pension Expense Capitalized ......... 1,783.12 | | |
|     Excess of Book Depreciation over | | |
|         Treasury Department Basis ....... (383.41) | | |
| | | 422,272.41 |
| Base Net Income ................................ | | 869,560.17 |
| Taxable Net Income $869,560.17 minus .22 ($25,000) | | |
|    divided by .48 ................................. | | 1,800,125.35 |
| Federal Normal Tax and Surtax at 52% (less $5,500) ....$ | | 930,565.18 |

The taxes for the years 1955 and 1956 were billed, reimbursed and paid in the same manner as 1954.

The algebraic formula included in these computations was used to determine the amount the two customers would have to pay plaintiff so that it could retain its five percent return on investment, after taxes. In order to retain $869,560.17 net income after taxes, under this formula, the customers had to pay plaintiff for its services in 1954 in addition to operating expenses and depreciation, taxable net income in the sum of $1,800,125.35.

The effect of this computation can also be computed, as plaintiff points out, by computing the initial 1954 tax on the $869,560.17 net amount after taxes as income, through successive pyramiding of tax on tax through 29 steps until the amount taxable in the last step is less than one cent. By adding this series of tax on tax, as plaintiff asserts, the total tax for 1954 is $930,565.18, which is the same tax derived by plaintiff in computing the tax under the algebraic formula first referred to herein, with a total taxable income of $1,800,125.35.

Whichever formula is applied, it is clear that if plaintiff or any other corporation, was to retain $869,560.17 net after taxes for 1954 it would have to pay $930,565.18 in taxes.

Under plaintiff's contention that the Government should receive only the tax payments from the first two computations of tax on income, instead of pyramiding for 29 steps, plaintiff would have paid:

Tax on $869,560.17 ........$446,671.29
Tax on $446,671.29 ........ 232,269.07

Total Tax as claimed
by plaintiff ..........$678,940.36

Claims for refund for the calendar year 1954 were filed in the amount of $251,624.82; for 1955 the sum of $247,876.63; and for 1956 the sum of $253,006.31, on the ground that only the initial tax reimbursement was properly includable in gross income and that as a result of the method followed in filing its tax returns, in compliance with Mimeos 6779 and 51, plaintiff had overpaid its income taxes for those three years. The parties have stipulated that any refunds recovered by plaintiff are to be reimbursed to its two consumers.

Was the change as to computation of income taxes reimbursed to the taxpayer, effected by Mimeos 6779 and 51 in 1952 by the Internal Revenue Service, a reasonable interpretation of the definition of gross income under the law?

The question of whether federal income taxes paid by another to or on behalf of a taxpayer are properly included in that taxpayer's gross income was decided by the Supreme Court in Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929). In that case an employer agreed to pay its employees a net salary, and to pay any federal income tax resulting from the salary. The Court stated (at page 729, 49 S.Ct. at page 504):

"Coming now to the merits of this case, we think the question presented is whether a taxpayer, having induced a third person to pay his income tax or having acquiesced in such payment as made in discharge of an obligation to him, may avoid the making of a return thereof and the payment of a corresponding tax. We think he may not do so. The payment of the tax by the employers was in consideration of the services rendered by the employee and was a gain derived by the employee from his labor. The form of the payment is expressly declared to make no difference. * * * It is therefore immaterial that the taxes were directly paid over to the Government. The discharge by a third person of an obligation to him is equivalent to receipt by the person taxed. The certificate shows that the taxes were imposed upon the employee, that the taxes were actually paid by the employer and that the employee entered upon his duties in

the years in question under the express agreement that his income taxes would be paid by his employer. * * * The taxes were paid upon a valuable consideration, namely, the services rendered by the employee and as part of the compensation therefor. We think therefore that the payment constituted income to the employee."

At the time of this decision of the Supreme Court in 1929, the directive of the Internal Revenue Service interpreting the tax statute required the taxpayer to include in additional taxable income only the initial tax reimbursement, without successive additions. The Supreme Court then concluded (at page 730, 49 S.Ct. at page 594):

"It is next argued against the payment of this tax that if these payments by the employer constitute income to the employee, the employer will be called upon to pay the tax imposed upon this additional income, and that the payment of the additional tax will create further income which will in turn be subject to tax, with the result that there would be a tax upon a tax. This it is urged is the result of the Government's theory, when carried to its logical conclusion, and results in an absurdity which Congress could not have contemplated.

"In the first place, no attempt has been made by the Treasury to collect further taxes, upon the theory that the payment of the additional taxes creates further income, and the question of a tax upon a tax was not before the Circuit Court of Appeals and has not been certified to this Court. We can settle questions of that sort when an attempt to impose a tax upon a tax is undertaken, but not now. * * * It is not, therefore, necessary to answer the argument based upon an algebraic formula to reach the amount of taxes due. The question in this case is, 'Did the payment by the employer of the income taxes assessable against the employee constitute additional taxable income to such employee?' The answer must be 'Yes.'"

After the change in directive by Internal Revenue Service Mimeos 6779 and 51 in 1952, this court decided the case of Connecticut Railway & Lighting Co. v. United States, 135 Ct.Cl. 650, 142 F. Supp. 907 (1956). There, the refunds sought were for payment of a second tax on the initial tax as income, prior to the change in ruling in 1952. Although this ruling stated that it was not applicable to taxable years prior to 1952, it nevertheless provided that:

"* * * except that any Federal income or excess profits taxes which have been paid on account of the inclusion in gross income of the taxes paid by the payor *will not be refunded.*" (Emphasis supplied).

After pointing out that from 1923 to 1952 the Government had added only the original tax as income, this court said at page 654, 142 F.Supp. at page 909:

"The Government does not rely on the 1952 regulations, hence we do not discuss them further. It says that what the plaintiff received was rent, and was therefore taxable as such. Of course what the plaintiff received was rent, and was just as useful to it as the so-called 'basic rent' on which the first tax was computed. But that it was therefore taxable is not so obvious. To say that it was taxable is to ignore 30 years of tax administration in which it was not taxed; is to ignore the fact that because of the Government's representation to the Supreme Court that it was not being taxed, the Court published that representation to all who were interested. We think that the law in action cannot be so divorced from the law in the books as to make the latter applicable only to an occasional unfortunate who happened to pay his taxes on the basis of the law in the books. The Government's disclaimer

of reliance upon the 1952 regulation with its express provision for discrimination, cannot erase the fact of the discrimination."

The court then concluded that the taxpayer was entitled to recover the second tax which it had paid on the initial tax as income for the years prior to 1952. In the present case the tax years in issue are 1954, 1955 and 1956, and there is no such discrimination as was found in Connecticut Railway & Lighting Co., supra.

While the earlier directive of the Internal Revenue Service in effect from 1923 to 1952 interpreted "gross income" as referred to in the taxing statute, as requiring a taxpayer such as plaintiff to add only the initial income tax paid by another to income in computing the final tax, this directive has not attained the force of law to the extent that it cannot be changed, if the change is not unreasonable or discriminatory.

■ The change effected by Mimeos 6779 and 51 in 1952 is not discriminatory; it requires plaintiff to pay income taxes to only the same extent required of any other corporation in order to retain the same net income after taxes.

This new 1952 directive by the Commissioner of Internal Revenue provided in part:

"Under a contract providing for payment to the lessor of a stipulated rental and any Federal income taxes thereon, the lessor is deemed to have received as rental income not only the stipulated rental, but in addition thereto all Federal income taxes paid by the lessee to, or for the account of, the lessor, * * *. The Bureau will not concern itself with the mechanics used by the respective parties in determining the extent of the lessee's liability so long as the lessor includes in gross income the total amount of Federal income taxes paid by the lessee."

■ Mimeo 51 extended this ruling to other types of income payments including the type provided for in plaintiff's contract with its two customers. Although this change in directive required that where the contract requires payment of income tax by a payor on stipulated payments to a payee, such income taxes must be included in payee's income. Plaintiff insists that this change in directive requires pyramiding tax on tax, or use of an algebraic formula in every case of tax reimbursement. We do not interpret the 1952 directive in this way. The directive *expressly disavows* any Bureau concern "with the mechanics used by the respective parties in determining the extent of the lessee's liability, so long as the lessor includes in gross income the total amount of Federal income taxes paid by the lessee." The construction of a pyramid can be stopped if the promise of the payor to pay the payee's taxes falls short of a promise to pay *all of the payee's tax*. The payor can agree to pay payee's income taxes on the principal payments of income required under the contract, to whatever partial or total extent the parties agree.

In the present case, after the 1952 change in directive by Mimeos 6779 and 51 plaintiff and its two customers could have revised their contract to provide that the customers would reimburse plaintiff only for the initial tax on net income, or to add to this only the initial tax as taxable income in reimbursing plaintiff. Plaintiff and its customers chose instead to provide in their contract for total reimbursement of all taxes with full knowledge of the change in directive effected by Mimeos 6779 and 51. Plaintiff obtained a refund of income taxes computed under this change for 1952 and 1953, under the retroactive relief provision for these two years specified by Section 92, Technical Amendments Act of 1958, 72 Stat. 1606, 1667. In 1955 plaintiff and its customers entered into a new contract, but made no change in its total tax reimbursement provision to avoid what it calls "pyramiding taxes," although it was free to determine "the mechanics used * * * in

determining the extent of" the customer's liability under Mimeos 6779 and 51. Actually, although the mechanics agreed upon in the contract shift the tax burden from plaintiff to its customers as part of the price of power, the ultimate tax on a guaranteed net income will remain the same. *Any corporation that retained plaintiff's net income in 1954, after taxes, of $869,560.17 would have to first pay income taxes of $930,565.18 or 52 percent of $1,800,125.35 taxable net income,* to retain that amount of net income after taxes. This is true whether the tax is computed on the algebraic formula chosen by plaintiff in its customers' power bill for 1954,[1] or whether it is computed by pyramiding, as plaintiff now chooses to to call it. As this court concluded in Connecticut Railway & Lighting Co. v. United States, supra (at pp. 652–653, 142 F. Supp. at p. 908):

> "To whatever degree reimbursement is carried in this type of case, the amount of the reimbursement is, in all reason, income. Having someone pay one's income taxes is just like having him put money in one's pocket, and if he does it pursuant to a lease, or an employment contract, it is just like rent or salary. * * * "

Under the Bureau's change in directive by Mimeos 6779 and 51, plaintiff and its customers were free to choose the degree and mechanics of reimbursement of income taxes. What plaintiff now asserts in effect is that having chosen full tax reimbursement of $930,565.18 by its customers in order to retain $869,560.17 net income after taxes, it should have paid 1954 taxes of only $678,940.36 under the former Treasury directive by adding only the initial tax to taxable income. Under this formula plaintiff would still keep its 1954 net income after taxes of $869,-560.17, return the claimed refund for 1954 of $251,624.82 to its affiliate customers, and the Government would collect 44 percent corporate income tax instead of the normal 52 percent for 1954, and also for 1955 and 1956. Nothing better illustrates the basic fallacy of plaintiff's position, which will persist as long as plaintiff continues to require its customers to pay *all its income taxes* and guarantee a five percent return on its investment after taxes.

Whether the change in interpretation by the Bureau is described as a regulation, ruling, or an internal directive, it was announced and published in 1952 by the Bureau for the information of taxpayers, and plaintiff does not assert lack of notice.

Plaintiff argues that for almost 30 years, under the former Bureau directive, the Government did not require pyramiding or the use of an algebraic formula but only required taxpayers to include the initial tax as taxable income. Plaintiff concedes in its reply brief that "while these actions may not be conclusive on this court, they should be persuasive." However, plaintiff also argues that the long-continued acquiescence by Congress in the announced directive of the Treasury Department from 1923 to 1952 affords such rule the force and effect of law. Such a rule would require Congress to change the basic statute each time there was a change in administrative construction, or to correct the interpretation. In this regard, the Supreme Court, in Helvering v. Wilshire Oil Co., 308 U.S. 90, 100, 60 S.Ct. 18, 84 L.Ed. 101 (1939) had this to say:

> " * * * The oft-repeated statement that administrative construction receives legislative approval by reënactment of a statutory provision, without material change * * * covers the situation where the validity of administrative action standing by itself may be dubious or where ambiguities in a statute or rules are resolved by reference to administrative practice prior to reënactment of a statute; *and where it*

---

[1] Base net income (5 percent on investment after taxes) ...... $869,560.17
Taxable net income $869,560.17 —.22 ($25,000) divided by .48.. 1,800,125.35
Federal normal tax and surtax at 52 percent (less $5,500) ..... 930,565.18

*does not appear that the rule or practice has been changed by the administrative agency through exercise of its continuing rule-making power.* It does not mean that a regulation interpreting a provision of one act becomes frozen into another act merely by reenactment of that provision, so that that administrative interpretation cannot be changed prospectively through exercise of appropriate rule-making powers." (Emphasis supplied.)

Two years after this change in 1952, Congress, in enacting the Internal Revenue Code of 1954, provided:

"§ 110. Income taxes paid by lessee corporation
"If—

"(1) a lease was entered into before January 1, 1954,

"(2) both lessee and lessor are corporations, and

"(3) under the lease, the lessee is obligated to pay, or to reimburse the lessor for, any part of the tax imposed by this subtitle on the lessor with respect to the rentals derived by the lessor from the lessee,

then gross income of the lessor does not include such payment or reimbursement, and no deduction for such payment or reimbursement shall be allowed to the lessee. For purposes of the preceding sentence, a lease shall be considered to have been entered into before January 1, 1954, if it is a renewal or continuance of a lease entered into before such date and if such renewal or continuance was made in accordance with an option contained in the lease on December 31, 1953." 26 U.S.C. 1958 ed., § 110.

The statute applies only to leases entered into before January 1, 1954, for taxable years beginning after December 31, 1953 where both lessor and lessee are corporations. For leases entered into after January 1, 1954, Congress did not change the effect of Mimeos 6779 and 51, as noted by the Report of the House Committee (House Report No. 1337, 83d Cong. 2d Sess. pp. 15–16, U.S.Code Cong. & Adm.News 1954, p. 4025 et seq.).

In 1958 Congress enacted another provision granting retroactive relief from this directive: [2]

"SEC. 92. INCOME TAXES PAID UNDER CONTRACT.

"(a) *Amendment of 1939 Code.*— Section 22 of the Internal Revenue Code of 1939 is amended by adding after subsection (o) the following new subsection:

"'(p) *Income Taxes Paid Under Contract by One Corporation for Another Corporation.—If—*

"'(1) a contract was entered into before January 1, 1952,

"'(2) under the contract, one party (hereinafter referred to as the "payor") is obligated to pay, or to reimburse another party (hereinafter referred to as the "payee") for any part of the tax imposed by this chapter on the payee with respect to the income derived under the contract by the payee from the payor, and

"'(3) both the payor and the payee are corporations,

then gross income of the payee shall not include any such payment or reimbursement other than the payment or reimbursement of the tax imposed by this chapter on the payee with respect to the income derived under the contract by the payee from the payor, determined without the inclusion of any such payment or reimbursement in gross income, and a deduction for all such payments or reimbursements shall be allowed to the payor but only to the extent that any such payment or reimbursement is attributable to an amount paid by the payor to the payee under the contract (other than any payment or reimbursement of the tax imposed by

2. Technical Amendments Act of 1958, 72 Stat. 1606, 1667, 26 U.S.C. § 22 and note.

this chapter) which is allowable as a deduction to the payor. \* \* \*'

"(b) *Effective Date, etc.*—The amendment made by subsection (a) shall apply with respect to taxable years beginning after December 31, 1951, to which the Internal Revenue Code of 1939 applies. \* \* \*"

This provision provides that as to certain contracts calling for reimbursement of taxes, only the first level of reimbursed taxes will be included in gross income of the payee, thereby applying the law as effective prior to the 1952 directives and as considered by the Supreme Court in Old Colony Trust Co. v. United States, supra. It is important to note, however, that by this statutory amendment the amelioration of the 1952 directive is made applicable only to contracts wherein both parties were incorporated and the contract was entered prior to 1952, while the amelioration is limited to the taxable years, 1952 and 1953. We find two very important and compelling conclusions implicit in the nature of this amendment.

First, implicit in this amendment of the 1939 Code to restore pre-1952 tax liability to certain contractual transactions is the legislative recognition of the efficacy of directives 6779 and 51 as causing the tax to be collected in a different manner absent the amendment. Certainly had Congress not recognized the efficacy of these directives there would have been no need for the amendment inasmuch as absent the efficacy of the directives the tax would have been collected in precisely the manner later prescribed by the amendment.

Second, is the fact that having recognized the efficacy of the directives and having ameliorated their effect for the taxable years 1952 and 1953 only as to certain contracts between corporate parties entered prior to 1952, Congress left the directives in effect as to liability arising from other contracts. Thus taxes arising on this type of income from contracts wherein at least one party lacked corporate status or from contracts entered subsequent to January 1, 1952, were left to be collected in the manner prescribed by the directives. It would seem that the recognition implicitly accorded the directives by the 1958 amendment in conjunction with the specific limitation of the scope of amelioration provided by the amendment, establish a legislative pattern sufficiently strong to indicate legislative acquiescence in the changes effected by the directives. In the face of the specific limitations placed upon the applicability of this 1958 amendment, plaintiff's argument that the amendment indicates legislative intention to restore pre-1952 collection procedures not only for the years 1952 and 1953, as specified in the amending statute, but for the tax years 1954, 1955, and 1956, now in question, appears misguided. If Congress had any such intention, it would certainly have amended the 1954 Code to make this clear rather than limiting the application of the old 1923–1952 type collection procedure to only the years 1952 and 1953. Mimeos 6779 and 51 now at issue in this case have had the effect of an administrative regulation for ten years since 1952, and have not been altered or revised, nor has the statute been altered except for the years 1952 and 1953.

■ We conclude that the change in interpretation of the taxing statute by Mimeos 6779 and 51 in 1952 by the Internal Revenue Service was not unreasonable or beyond its discretion under the law. Plaintiff is not entitled to recover and its petition is dismissed.

It is so ordered.

JONES, Chief Judge, and LARAMORE, Judge, concur.

WHITAKER, Judge (dissenting).

The problem in this case is not an easy one, but it is the constantly recurring one of ascertaining the intent of Congress, and adjudicating the rights of the parties in accordance with that intent.

Congress has defined income to mean "all income from whatever source derived, including (but not limited to) the

following items." The items that follow do not touch our problem. Our problem is this:

Plaintiff, as the producer of electricity, sold its output to two companies, each of whom contracted to pay plaintiff an amount equal to 5 percent of its invested capital, plus the taxes plaintiff would be required to pay because of the receipt of this income. These contracts were entered into in 1931. From that time until 1952, plaintiff paid taxes, not only on this 5 percent but also on the amount paid it to reimburse it for the taxes it was required to pay because of the receipt of this income.

This was in accord with the holding of the Supreme Court in Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918.

It met with the approval of the Internal Revenue Service until 1952. Indeed, the Commissioner of Internal Revenue, in response to plaintiff's inquiry, wrote it on December 17, 1941, as follows:

"It is well established that the payment of a tax by a person other than the taxpayer constitutes income to the taxpayer in whose behalf the tax is paid. In such cases it is the practice of the Bureau to include such payment as additional income to the person on whose behalf the payment is made, *but beyond that point the Bureau will not pyramid liability.* Accordingly, in the case you submit there should be but one addition to the income of the Safe Harbor Water Power Corporation by reason of the taxes paid on its behalf by Consolidated Gas Electric Light and Power Company of Baltimore." [Emphasis supplied.]

The various revenue acts from 1931 to the tax years in question had all contained the all-inclusive definition of gross income, quoted above, but neither the Supreme Court nor the Internal Revenue Service had sanctioned the inclusion in gross income of more than the initial payment of taxes due, because of the receipt of the income stipulated for in the contract between the payee and the payor. The Internal Revenue Service was charged with the duty, of course, of collecting taxes on all income which Congress had intended to include within the meaning of that word, but the Internal Revenue Service had never asserted that Congress meant to include more than the first payment made to reimburse the payee for its tax liability.

Theoretically, of course, when the initial payment is made to reimburse the payee for its tax liability, this is income to the payee, and taxes are due on this income, and when reimbursement is made for these taxes, additional income results, and so on *ad infinitum.* But the Internal Revenue Service never asserted Congress intended to include such payments in income, that is, not until 1952. In that year it was asserted Congress did intend to do so. Did it? If so, it had kept such an intent well concealed.

The first income tax Act was enacted in 1913. For nearly 40 years the Bureau had not thought that Congress had required such an inclusion, and Congress reenacted the same definition of gross income many, many times without any effort to correct this Bureau interpretation. Apparently, Congress was satisfied that the Bureau had correctly divined its intention. If it had not thought so, it would have corrected it.

What warrant, then, did the Commissioner of Internal Revenue have in concluding in 1952 that Congress had meant something else, since there had been no change in this definition of gross income? I know of none.

Of course, this mimeograph was effective only as an interpretation of what Congress intended. It could neither add to nor subtract from what Congress had enacted. It seems to me, Congress had intended, when it enacted the last Revenue Act, what it had intended from the beginning, and what the Bureau had always supposed it had intended. Nothing Congress had done justified any depar-

ture from the time-honored interpretation of its oft-repeated language.

What then of the 1954 Revenue Act? That has relevance here because it was passed prior to the tax years in question. Did it change the prior congressional definition of gross income?

It said that as to one particular class of income, and as to that class alone, that there should not be included therein even the first payment on account of taxes. This, of course, was contrary to the ruling of the Supreme Court in the Old Colony case, but this was in the province of Congress, since the Supreme Court in that case was construing the intent of Congress.

But what of contracts other than those dealt with in section 110 of the 1954 Revenue Act? Did Congress mean to leave the tax consequences under them the same as it had been before? The Act itself is silent on this and the Committee reports furnish no light.

But, since Congress for many years had given its tacit approval of the Bureau policy against pyramiding, it would seem that it would have expressly permitted it, had it wished to change this policy. It did not do so.

When Congress did put its mind on the inclusion within gross income of taxes paid to reimburse the payee, it provided that not even the initial payment of taxes should be included in the payee's income. This provision of the Revenue Code of 1954 was limited to rental income; but if Congress did not mean to tax even the initial payment on account of taxes on rental income, is there any reason to suppose it meant to tax the initial payment, and the next and the next, with respect to other income? But, at any rate, it did not deal with other income, and as to it, it left the law as it was.

So, the question is, what was the law prior to the Revenue Act of 1954? As I have said above, it was as it had been interpreted by the Bureau for 35 or 40 years, and tacitly approved by the Congress over this period. I cannot conceive that Congress intended, by this omission to deal with income other than rental income, to override the long established practice of the Bureau, tacitly approved by it by its repeated reenactment of its definition of gross income, and, instead, intended to give its approval to this change in the Bureau's interpretation. If Congress did not approve it, it is ineffective.

Since Congress had its mind on taxes on rental income, it would seem it would have made provision for other income, but it did not do so. Having failed to do so, for whatever reason, the law remained as it had been prior to the enactment of the 1954 Revenue Act.

The mimeographs did not change the law; they only changed the Bureau's interpretation of it. The Bureau's prior interpretation had been tacitly approved by Congress; the change in interpretation had never been approved, unless it was approved by the Technical Amendments Act of 1958. This was passed after the taxable years in question; but, even so, it did not approve the changes in interpretation by the Bureau as set out in its mimeographs. On the other hand, it expressly disapproved of pyramiding.

In conclusion, it is impossible to ascribe to Congress the intention to approve an interpretation of its language of "income from whatever source derived," which would permit pyramiding of the tax. This leads to an absurd result. The initial payment by the purchasers of plaintiff's power was in an amount of $869,560.17; by pyramiding, the tax amounts to $930,565.18. We cannot ascribe to Congress such a grotesque intention.

For these reasons, I dissent.

DAVIS, Judge, took no part in the consideration and decision of this case.