**The Reverend Gerald P. FOGARTY, S.J., Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85–1218.**

United States Court of Appeals, Federal Circuit.

Jan. 2, 1986.

Thomas Arden Roha, Williams, Myers and Quiggle, Washington, D.C., argued, for appellant. With him on brief were John Holt Myers and Susan L. Flaherty.

John P. Griffin, Tax Div., Dept. of Justice, Washington, D.C., argued, for appellee. With him on brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup and Richard Farber.

James J. Ryan, William V. Finn and William F. Russo, Taft, Stettinius & Hollister, Cincinnati, Ohio, were on brief, for amicus curiae.

Before BALDWIN, KASHIWA and BENNETT, Circuit Judges.

BALDWIN, Circuit Judge.

The Reverend Gerald P. Fogarty, S.J. (Father Fogarty) appeals from the decision of the United States Claims Court, rendered on cross motions for summary judgment and reported at 6 Cl.Ct. 612 (1984), which held that Father Fogarty had earned income as an associate professor at the University of Virginia in his individual capacity, not as an agent of his religious order, and therefore had realized taxable income. We affirm.

### Background

The facts are not in dispute. Father Fogarty is a Roman Catholic priest and member of the Society of Jesus religious order (Jesuits or Order). He is bound to the Order by vows of chastity, poverty, and obedience. Teaching is an essential and traditional mission of the Order. In keeping with this mission, Father Fogarty was directed by his religious superior to pursue an invitation that had been extended to him

to interview for a teaching position at the University of Virginia's Department of Religious Studies. The interview led to an offer for an associate professorship, and upon instruction from his supervisor, Father Fogarty accepted the position. The letter of invitation specified that his duties would be determined by the head of the Religious Studies Department. That person understood that Father Fogarty's acceptance and retention of the teaching position was subject to the dictates of his religious superior and to conformance with the Order's teaching mission. Nonetheless, his teaching position involved no agreement between the University and his Order.

Father Fogarty taught courses on Catholic religious thought, development, and history. He received a monthly salary from the University in the form of a payroll check made payable to him individually. Pursuant to his instruction, the University deposited these checks in a checking account in the name of the Corporation of Roman Catholic Clergymen (an account of the Order). Father Fogarty and the Order's provincial treasurer had signature authority for the account as agents of the Corporation. The amounts deposited were not Father Fogarty's to keep, for under the canon law of the Catholic Church and pursuant to his vow of poverty, he had no right to receive, direct the use of, or dispose of the monies for his own benefit. During the two-year period of his teaching position, his entire salary went to the Order and the Order provided him living expenses.

For the tax years 1977 and 1978, the University paid Father Fogarty wages in the respective amounts of $18,122.20 and $18,683.31. The University had not withheld either social security taxes or federal income taxes from these amounts. Father Fogarty did not file 1977 or 1978 tax returns because he believed the amounts paid by the University to be tax-exempt income of his Order. Subsequently, the Internal Revenue Service (IRS) determined that he was obligated to report the income as his own, and accordingly assessed tax liability of $317 and $1,562 for the respective years.

The amounts were paid, refund claims were denied, and suit was brought in the United States Claims Court.

After receiving briefs and hearing oral argument, the Claims Court granted the government's cross-motion for summary judgment. Father Fogarty had argued that a fundamental tenet of federal taxation teaches that funds received as an agent for a principal and used solely for the principal's benefit are taxable to the principal and not to the agent; that by virtue of the vows that bound him to the Order, he could act only as an agent on behalf of the Order; and thus that the income generated from his employment with the University was income of the Order. The government had argued that, regardless of how one may choose to characterize Father Fogarty's relationship with his Order, the real issue is whether the University viewed itself as contracting with Father Fogarty as an agent for the Order or, instead, with him in his individual capacity. The government also cited a number of revenue rulings for the principle that an agency relationship is established when it appears, based on all the facts and circumstances, that the employer or payer of the income is looking directly to the order, rather than to the individual member, for the performance of services. *See, e.g.,* Rev.Rul. 132, 1979–1 C.B. 62, 63; Rev.Rul. 84–13, 1984–4 I.R.B. 5; Rev.Rul. 267, 1981–2 C.B. 196; Rev.Rul. 290, 1977–2 C.B. 26. The government analogized Father Fogarty's situation to cases in which services are rendered to a third party by an individual who claims to be acting as a "loaned out" employee of a corporation and who thus claims that payments received for those services are income of the corporation, not the individual. The government cited *Johnson v. United States,* 698 F.2d 372 (9th Cir.1982), as applying a two-part test for determining whether a "loaned out" employee was acting in his individual capacity or as an agent of the "loaning" corporation: (1) whether the "loaning" corporation has the right to control the activities of the individual and the amount of

compensation the individual receives for those activities; and (2) whether this control has been recognized and accepted by the contracting party.

The Claims Court concluded that the government's argument was controlling, and framed the issue as: "to whom did the third party look for the accomplishment of the services it bargained for—to [Father Fogarty] or to his Order?" The court then said:

> On the facts of this case there can only be one answer to that inquiry. The University extended its invitation for interview to plaintiff, not to his Order. The University concluded its employment agreement with plaintiff, not with his Order. The University paid wages for the services received to plaintiff, not to his Order. And finally, it was the University that exercised administrative control over plaintiff's duties as a professor, not his Order.

> Given these considerations, there is no case here for saying that the University dealt with plaintiff as a representative acting in behalf of his Society. The few relevant facts are consistent with only one view: that plaintiff was asked to speak for himself and did so. Nothing in the facts would permit the court to say that either side demonstrated an intention to include the Maryland Province of the Society of Jesus as a party to the contract, much less that such a purpose had, in fact, been accomplished.

On appeal, Father Fogarty argues that the Claims Court erred in failing to recognize the fundamental tax principle that funds received as agent for a principal and used solely for the principal's benefit are not includible in the agent's gross income; that the Claims Court erred in resolving the case under the assignment of income doctrine according to cases like *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930), rather than according to the rule of *Poe v. Seaborn*, 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930); and that the IRS improperly changed a 60-year administrative practice of treating members of religious orders, who live vows of poverty, as agents for their orders in earning income.

## OPINION

■ Section 61 of the Internal Revenue Code of 1954 states that, except as otherwise provided, gross income includes all income from whatever source derived. Section 61(a)(1) identifies compensation for services as income. A basic tenet of the law of federal income taxation is that income is taxable to the person who earns it. *United States v. Basye*, 410 U.S. 441, 447, 93 S.Ct. 1080, 1084, 35 L.Ed.2d 412 (1973); *Commissioner v. Culbertson*, 337 U.S. 733, 739-40, 69 S.Ct. 1210, 1212-13, 93 L.Ed. 1659 (1949); *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930).

In *Lucas v. Earl*, the taxpayer entered into an assignment contract with his wife which provided that income earned by either spouse would be treated as belonging equally to both. The Supreme Court held that this assignment of income was ineffective under the Federal income tax law to shift income to the assignee:

> There is no doubt that the statute could tax salaries to those who earned them and provide that the tax could not be escaped by anticipatory arrangements and contracts however skilfully devised to prevent the salary when paid from vesting even for a second in the man who earned it. That seems to us the import of the statute before us and we think that no distinction can be taken according to the motives leading to the arrangement by which the fruits are attributed to a different tree from that on which they grew.

281 U.S. at 114-15, 50 S.Ct. at 241.

The doctrine has gone beyond a simplistic approach of looking only to who performed the labor. Even before *Lucas v. Earl*, it had been recognized that where an agent earns income on behalf of the principal within the scope of the agency and remits the income to the principal according to the agency relationship, the income is the principal's and not the agent's. *Maryland Casualty Co. v. United States*, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297

(1920). In a decision that issued shortly after *Lucas v. Earl,* the Court applied the agency principle to allocate the income earned by one spouse (the agent of the marital community) equally between both spouses. *Poe v. Seaborn,* 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930). Appellant asks us to apply that rationale to a religious order and its members.

In *Poe v. Seaborn,* the taxpayer and his wife were residents of the State of Washington, under whose community property laws the income of either spouse was treated as belonging equally to the other. For the year 1927, the husband and wife filed separate returns, each reporting one-half the family income, which was comprised of the husband's salary, plus interest, dividends, and gains from sales of real and personal property.

The Supreme Court held that, based on the state's community property laws, each spouse was taxable on one-half of the total income received by both spouses regardless of the proportion of income earned by each. In responding to the government's argument that the husband had broad powers of control and management over the property and thus should be considered the owner for tax purposes, the Court said the community (husband and wife) must act through an agent and the husband was created by law as the agent of the community. The Court distinguished the situation from that in *Lucas v. Earl*:

> The very assignment in that case was bottomed on the fact that the earnings would be the husband's property, else there would have been nothing on which it could operate. That case presents quite a different question from this, because here, by law, the earnings are never the property of the husband, but that of the community.

282 U.S. at 117, 51 S.Ct. at 61.

A careful reading of *Poe* indicates to us that the division of income and the agency relationship of the wage-earning spouse depended on the *operation of state community property laws.* Appellant does not contend that the ownership rights involved between the Jesuit Order and its members are given effect by operation of law. Rather we are told that the religious order's ownership rights, arising from the member's legal relationship with the Order, which is defined by the member's vows and is established by canon law of the Catholic Church, are given effect in civil courts. Although such a right may be enforced in law,[1] an enforceable civil right arising from church law is not the same as a right or legal relationship which is created by operation of state law. In the latter, the state has given its sanction for policy reasons. We are mindful of the analogies that can be made between the marital community and religious community, e.g., that vows are special commitments directed toward the purpose of the marital or religious life and are not mere contractual arrangements devised to avoid federal taxation, and that property acquired by a member of the community becomes community property that inures to the benefit of the community. We also do not doubt that, as in the *Poe* situation, where it was unlikely that taxpayers would be induced by tax savings to relocate from a common law to community property jurisdiction, it would be unlikely here that taxpayers would be motivated for tax reasons to attempt joining a legitimate religious order particularly where the professing and living of the vows would include the loss of right to receive income on one's own behalf. Nevertheless we are not disposed to elevate the relationship between order and member above any other arrangement between private parties under the *Poe* rationale.

▮ In sum, we conclude that the holding and rationale of *Poe* do not compel

---

1. *See, e.g., Order of St. Benedict v. Steinhauser,* 234 U.S. 640, 34 S.Ct. 932, 58 L.Ed. 1512 (1914); *Watson v. Jones,* 13 Wall. 679, 80 U.S. 679, 20 L.Ed. 666 (1871); *Rosicrucian Fellowship v. Rosicrucian Fellowship Non-Sectarian Church,* 39 Cal.2d 121, 245 P.2d 481, 487–88 (Cal.1952), *cert.* *denied,* 345 U.S. 938, 73 S.Ct. 828, 97 L.Ed. 1365 (1953); *Canovaro v. Brothers of Order of Hermits of St. Augustine,* 326 Pa. 76, 191 A. 140, 146 (1937); *Maas v. Sisters of Mercy of Vicksbury,* 135 Miss. 505, 99 So. 468, 470 (1924).

treating a member who lives his vows as being *ipso facto* an agent of the Jesuit Order for tax purposes. We now examine the argument that the IRS cannot change a prior administrative practice of treating members of religious orders as agents for their orders in earning income.

The Commissioner's seminal ruling on the taxability of members of religious orders was O.D. 119, 1 C.B. 82 (1919), which stated in pertinent part:

> Members of religious orders are subject to tax upon taxable income, if any, received by them individually, but are not subject to tax on income received by them merely as agents of the orders of which they are members.

Appellant argues that the Commissioner had consistently applied O.D. 119 from 1919 to 1977 in ruling that a member of a religious order who was required to turn over to the order all income pursuant to a vow of poverty was merely an agent of the order and was therefore not taxable in an individual capacity.[2] In 1977, appellant argues, the IRS reversed itself on the issue of taxation of members of religious orders. Appellant and amici[3] contend that the prior practice had acquired the force of law and that the IRS could not reverse a long-standing and widely-applied administrative practice absent a change by Congress in the statute.[4]

The government contends that the IRS did not reverse its position in 1977 and that revenue rulings prior to 1977 applying the general principle stated in O.D. 119 are consistent with the IRS's present position.[5] In any event, says the government, the Supreme Court has made clear, as recently as in *Dickman v. Commissioner,* 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), that the Commissioner is free to change a prior administrative practice and may even do so retroactively.

In 1977, the IRS issued Revenue Ruling 77–290, 1977–2 C.B. 26 which posed the cases of licensed attorney *A* and trained and experienced secretary *B*, members of a religious order, who have taken vows of poverty by which all claims to earnings are renounced and the earnings belong to the order. *A* was instructed by the order's superiors to obtain employment with a law firm not connected with the order, and *B* was instructed to obtain employment with the local business office of the church that exercises general administrative supervision over the order. *A* and *B* accepted employment. *A* had the law firm remit salary payments directly to the order and *B* remitted to the order all remuneration received from the church. The IRS ruled that *A* is not acting as an agent for the order in performing legal services for the law firm, noting additionally that "private practice of law by *A* for individual clients … is not the performance of services of the type ordinarily required by members of the religious order." On the other hand, *B*'s services are "services performed for another agency of the church as an agent of the religious order." Revenue Ruling 77–290 also provides that "O.D. 119 is superseded since the conclusion set forth therein is restated under current law in this Revenue Ruling." In fact, the Ruling does restate O.D. 119:

---

**2.** The last IRS ruling, prior to 1977, pointed to is Rev.Rul. 68–123, 1968 C.B. 35, which provided that a nun, who was subject to a vow of poverty and who turned over to the order all of her income earned as a nurse in a hospital, was not taxable on the income as earned because she was acting as an agent of the order.

**3.** Amici curiae, who represent that they have tax cases before the Claims Court which may be affected by resolution of this action, have been permitted to file a brief in this court.

**4.** *E.g., National Muffler Dealers Assoc., Inc. v. United States,* 440 U.S. 472, 99 S.Ct. 1304, 59

L.Ed.2d 519 (1979); *Cammarano v. United States,* 358 U.S. 498, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959); *First National City Bank v. United States,* 557 F.2d 1379 (Ct.Cl.1977).

**5.** Although a number of revenue rulings are cited, Resp.Br. at 18 n. 9, the only pertinent one appears to be Rev.Rul. 76–323, 1976–2 C.B. 18 (members of religious order pursuing employment as plumber and construction worker were not agents of the order with respect to such services).

[I]ncome earned or received by a taxpayer as a principal, and not as an agent, is taxable to the taxpayer....

....

[I]n cases where a member of a religious order receives income as an agent of the order, and, pursuant to a vow of poverty, remits the income to the order, such income is the income of the order and not of the member.

We think it is clear that O.D. 119 adopted no flat rule that members of religious orders were always to be regarded as agents of their orders for federal tax purposes, but merely announced that income received in a representative capacity, as opposed to in an individual capacity, would not be taxable to the member. Thus, Rev.Rul. 77–290 has not changed the principle set forth in O.D. 119 that income received by a member as agent for the order is not taxable income of the agent. Indeed, the principle is deeply rooted in the law. *Maryland Casualty Co. v. United States*, 251 U.S. 342, 347, 40 S.Ct. 155, 157, 64 L.Ed. 297 (1920).

Assuming that what the Commissioner has done[6] is to change an administrative practice of treating members of religious orders *ipso facto* as agents of their orders to one of inquiring into the facts underlying the agency determination, we conclude that this type of change is permitted under the rationale of *Dickman v. Commissioner*, 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984).

The issue in *Dickman* was whether the donor-taxpayer was subject to the gift tax with respect to certain interest-free loans he had made. The taxpayer asserted that the Commissioner's determination of gift tax liability was contrary to a long-standing administrative practice—i.e., of not construing the gift tax statutes and regulations to authorize the levying of gift tax on the value of the use of money or property. The Court answered:

Even accepting the notion that the Commissioner's present position repre-

sents a departure from prior administrative practice, which is by no means certain, it is well established that the Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect. *E.g., Dixon v. United States*, 381 U.S. 68, 72–75 [85 S.Ct. 1301, 1304–05, 14 L.Ed.2d 223] (1965); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 183–84 [77 S.Ct. 707, 709, 1 L.Ed.2d 746] (1957). This rule applies even though a taxpayer may have relied to his detriment upon the Commissioner's prior position. *Dixon v. United States, supra,* at 73 [85 S.Ct. at 1304]. The Commissioner is under no duty to assert a particular position as soon as the statute authorizes such an interpretation. See also *Bob Jones University v. United States*, 461 U.S. 574 [103 S.Ct. 2017, 76 L.Ed.2d 157] (1983).

*Id.* at 343, 104 S.Ct. at 1094 (footnotes omitted).

Our predecessor, the Court of Claims, has also recognized the Commissioner's authority to alter certain prior administrative practices without congressional impetus. While the court refused to allow the Commissioner to apply altered practice retroactively in a discriminatory manner, *see, e.g., Connecticut Railway & Lighting Co. v. United States*, 142 F.Supp. 907, 135 Ct.Cl. 650, 653–54 (1956), the court in *Safe Harbor Water Power Corp. v. United States*, 303 F.2d 928, 157 Ct.Cl. 912 (1962), had no difficulty upholding a nondiscriminatory prospective application:

While the earlier directive of the Internal Revenue Service in effect from 1923 to 1952 interpreted "gross income" as referred to in the taxing statute, as requiring a taxpayer such as plaintiff to add only the initial income tax paid by another to income in computing the final tax, this directive has not attained the force of law to the extent that it cannot

---

**6.** It may well be that prior to the 1970's, the IRS always treated income of members as income of their orders. For purposes of decision, we will assume so.

be changed, if the change is not unreasonable or discriminatory.

*Id.* 303 F.2d 928, 157 Ct.Cl. at 919–20.

*National Muffler,* cited by appellant, is distinguishable from the present situation because that case involved the validity of regulations promulgated by the Treasury. Longstanding treasury regulations that have not been affected by subsequent reenactment or amendment of the underlying statutes are deemed to have acquired the force of law. *See, e.g., Knapp King-Size Corp. v. United States,* 527 F.2d 1392, 1400, 208 Ct.Cl. 533, 548 (1975). Here, the prior administrative practice at most was expressed in revenue rulings and private letter rulings interpreting or applying an office decision. We also note that the Commissioner's present interpretation has not been applied retroactively to appellant since the relevant tax years are 1977 and 1978.

■ Having determined that the Commissioner was not bound by any prior administrative practice to treat members of religious orders as always being agents for their orders for federal tax purposes, we now consider the issue of whether the Claims Court's ultimate conclusion—that appellant earned income in an individual, rather than representative, capacity—can stand. The agency issue is one of first impression in this court.

A determination of whether a member of a religious order earns income in an individual capacity, or as an agent of the order, is a question of law based on general rules of agency to be established by considering all the underlying facts. *See* 2 J. Mertens, *Law of Federal Income Taxation* § 17.11 (1982); Restatement (Second) of Agency § 1(1), comment b, § 26 (1958); *cf. Commissioner v. Culbertson,* 337 U.S. 733, 742, 69 S.Ct. 1210, 1214, 93 L.Ed. 1659 (1949) (reviewing factors in determining whether parties intended to carry on a business in a partnership relation).

There is no fixed way to approach the issue. The presence of unique facts in each case will inevitably lead the court to place more emphasis on one or more factors and less on others. The relationship between the order and the member gives rise to a number of factors. Relevant considerations there will include the degree of control exercised by the order over the member as well as the ownership rights between member and order, *Kelley v. Commissioner,* 62 T.C. 131 (1974), the purposes or mission of the order, and the type of work performed by the member vis-a-vis those purposes or mission,[7] Rev. Rul. 77–290 (member who was a lawyer with law firm representing private clients).

Other factors will include the dealings between the member and the third-party employer (circumstances surrounding job inquiries and interviews, and control or supervision exercised by the employer), and dealings between the employer and order. Although appellant argues that the agency relationship does not depend on the relationship between the principal (the order) and the third party (the employer), we believe that dealings between the two are certainly objective evidence that may be considered. Nonetheless, we do not adopt any so-called "triangle theory" which requires a contractual arrangement between the third party employer and the order, as in *Schuster v. Commissioner,* 84 T.C. 764 (1985) (reviewed decision), nor the two-part test applied to the "loaned out" employee situation in *Johnson v. United States,* 698 F.2d 372 (9th Cir.1982). We prefer a flexible approach that will take account of diverse factual circumstances.

■ Appellant contends that the Claims Court made controlling the question of to whom the University looked for the performance of services, and therefore ignored other important factors in the agency analysis. While the Claims Court may have said that the question was "control-

---

7. In a different context, involving the definition of "employment" for FICA tax purposes, we considered whether the services performed by a member of a religious order were ordinarily the duties of the order and must be performed by the member on behalf of the order. *Samson v. United States,* 743 F.2d 884, *reh'g denied,* 746 F.2d 807 (Fed.Cir.1984).

ling," we review judgments, not statements in opinions. *Atlas Powder Co. v. E.I. DuPont de Nemours,* 750 F.2d 1569, 1582 (Fed.Cir.1984). Our review of the decision indicates that the court considered all the undisputed facts of record; indeed, in the two paragraphs of its opinion which we quoted earlier, the court enumerates those facts which led it to conclude that appellant did not receive income from the University as an agent of the order.

Although the undisputed facts present a very close case, we see no basis for reversing the judgment below that Father Fogarty taught at and received income from the University of Virginia on his own behalf rather than on behalf of the Order.

AFFIRMED.