**Francine SCHUSTER,
Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL
REVENUE SERVICE,
Respondent-Appellee.**

No. 85–2345.

United States Court of Appeals,
Seventh Circuit.

Sept. 4, 1986.

Rehearing and Rehearing En Banc
Denied Nov. 12, 1986.

William J. Falk, Thompson & Mitchell, St. Louis, Mo., for petitioner-appellant.

Teresa E. McLaughlin, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and BARKER, District Judge.*

* The Honorable Sarah Evans Barker, District Judge of the United States District Court for the Southern District of Indiana, sitting by designation.

BARKER, District Judge.

Sister Francine Schuster ("Schuster") filed a petition in the Tax Court contesting a determination by the Commissioner of Internal Revenue that her income was taxable against her individually for wages she earned in 1980. The Tax Court sustained the Commissioner's determination. We affirm.

## I.

Schuster, a Roman Catholic nun, is a member of the Order of the Adorers of the Blood of Christ ("the Order"). The Order is a tax-exempt religious organization whose purposes are "to conduct schools and places of learning and to promote education, to advance the cause of religious and social work, to conduct hospitals and institutions for the care and treatment of suffering humanity and to do all and everything necessary or convenient for the accomplishment of any of the purposes or objects and powers above mentioned or incidental thereto."

As a condition of membership in the Order, Schuster was required to make perpetual vows of poverty, chastity, and obedience. In accordance with her vow of poverty, Schuster executed a declaration in which she agreed "never [to] claim or demand, directly or indirectly, any wages, compensation, remuneration, or reward ... for the time or for the services or work that I devote for or with ... [the Order] during the time I may remain there or elsewhere in the name of or upon commission from said [Order]."

Members may withdraw from the Order either with or without official dispensation from the Church. Withdrawing members are entitled to receive any personal property they owned before joining the Order, any property received by gift or inheritance, and any dowries they may have had.

Members are allowed to secure employment in occupations that relate to the Order's general purposes, subject to approval

by a Provincial Superior of the Order. Approval turns upon whether the proposed mission relates to religious and charitable works that promote education, relieve suffering, and otherwise provide assistance to those in need. However, pursuant to a member's vow of obedience, she may not accept employment without approval of the Order. No member can voluntarily terminate her employment without the Order's approval. In addition, each member promises to abide by any direction of the Provincial Superior, even if such direction relates to the performance of the employment itself or requires the member's withdrawal from the employment. The Order has, on occasion, required members to terminate their assigned employment.

Pursuant to their vows, members are not entitled to retain any funds generated by their employment; rather, the Order is entitled to all such funds. After a member transfers such funds to the Order, she maintains no control over the disposition of the funds.

Members generally live in a convent. When, however, a member's employment is not located near a convent, the Order rents a residence for the member. These members living away from the convent submit monthly budget statements of living expenses to the Order, which the Order pays if the expenses are approved. In addition, the Order provides its members with a personal expense allowance.

In October, 1978, Schuster, who has a bachelor's degree in nursing, was awarded an educational grant from the federal government under Section 822(b) of the Public Health Service Act. The award covered the cost of Schuster's tuition, books, fees, living and moving expenses for the Nurse Midwife Program at the University of Mississippi Medical Center. As a condition of receiving the grant, Schuster agreed to reside and practice in a "health man-power shortage area" (as defined in Section 332 of the Public Health Service Act) for a 12–month period upon her completion of the training program. In addition, Schuster agreed to repay in full the amount of the grant if she failed to fulfill the practice commitment.

Upon completion of the Nurse Midwife Program, Schuster obtained permission from the Order to apply and to interview for positions in health manpower shortage areas. One position Schuster applied for was with Su Clinica Familiar ("the Clinic"), a family health service clinic in Raymondville, Texas.

During the year at issue, the National Health Services Corps ("NHSC"), a division of the United States Public Health Service, furnished the services of a number of health professionals in its employ to the Clinic. The health professionals provided by the NHSC to the Clinic were employed and compensated by the federal government, and not by the Clinic.

Schuster filed an application for employment with the NHSC in conjunction with her application to the Clinic. She applied for the job in order to fulfill her commitment to practice in a health manpower shortage area. She stated on her application to the NHSC that she would accept a position only if she were assigned to work at the clinic at a salary of at least $16,-000.00 per year.

Schuster was interviewed over the telephone by an employee of the NHSC. In late May, 1979, the NHSC paid for Schuster to travel to the Clinic to visit as a prospective NHSC assignee. On June 27, 1979, the Clinic informed the NHSC that it intended to employ Schuster as a staff nurse-midwife beginning on July 23, 1979.

After Schuster was offered employment with the NHSC as a nurse-midwife at the Clinic, she requested and was granted permission from the Order to accept it. Accordingly, on July 1, 1979, Schuster wrote a letter to the NHSC confirming her acceptance of the appointment, effective July 29, 1979.

Also on July 1, 1979, the Acting Provincial Administrator of the Order wrote two letters. One letter was written to the director of the Clinic's nurse-midwifery service, and a second, virtually identical letter,

was written to NHSC. These letters stated in part:

Sister Francine Schuster has informed us of your recent phone notification of a current job opening in nurse-midwifery at Su Clinica Familiar, Raymondville-Harlingen, Texas.

The Community of Adorers of the Blood of Christ [the Order] would like to contract with you for the services of Sister Francine Schuster, ASC, for the position of nurse-midwife for one year at Su Clinica Familiar.

If our offer is acceptable, we request that payment for her services be made to the Adorers of the Blood of Christ.

In response to the letter addressed to the Clinic, the director of the nurse-midwifery service at the Clinic in a July 9, 1979 letter to the Acting Provincial Administrator of the Order, wrote, in pertinent part:

Consider this letter as formal acceptance of Sister Francine Schuster on our nurse-midwifery staff. She will be beginning on the pay period that starts July 23. Sister Francine's checks will be paid to her and she can endorse them and send them to you. I endorse my checks "paid to the order of the Sisters of St. Mary. Sister Angela Murdaugh." There is no problem with them going through the mail like that.

The NHSC did not respond to the July 1, 1979 letter from the Acting Provincial Administrator of the Order.

Schuster began to work at the Clinic on July 25, 1979, even though her NHSC appointment was not effective until July 29. As a result, the Clinic paid Schuster for July 25–27 and terminated payments effective July 27. Contrary to the Order's request, Schuster's paychecks were issued payable to her individually.

Schuster's appointment by the NHSC became effective on July 29, 1979. As an employee of the NHSC, Schuster was a civil service employee subject to the standards of conduct set by the Department of Health, Education and Welfare, and her performance as a midwife was evaluated yearly by means of the Department's employee performance appraisal system. As an NHSC staff member, Schuster qualified for and received continuing professional education at the expense of the federal government. In addition, Schuster was protected against malpractice claims arising from her employment pursuant to Section 224 of the Public Health Service Act.

Schuster's initial annual salary as a nurse-midwife was $15,920, the rate applicable to federal employees at the GS–9 level. During her tenure at the Clinic, Schuster received both a within-grade increase in her salary and an increase pursuant to Executive Order. In addition, Schuster accumulated annual and sick leave at the same rate as did other federal employees with comparable service. The Order did not provide the NHSC or the Clinic with a replacement when Schuster used sick leave.

While employed by the NHSC, Schuster was paid by checks drawn on the United States Treasury and made payable to her individually. Neither the Clinic nor the NHSC imposed any restriction on her use of payroll checks. Schuster endorsed to the Order each check tendered to her, and she mailed each check to a lockbox maintained by the Order in St. Louis.

Schuster terminated her association with the Clinic in 1982, when the federal funding for her position with the NHSC was discontinued. Upon her separation from the NHSC, Schuster was paid for 128 hours of accrued, but unused, annual leave.

On her 1980 federal income tax return, Schuster reported that she had received $18,771.20 in wages, but that the compensation was not taxable to her because she had received it as an agent on behalf of the Order. On May 14, 1982, the Commissioner of Internal Revenue issued a notice of deficiency to Schuster reflecting his determination that Schuster's wages were taxable to her individually and not to the Order, because she was not working as an agent of a religious order when she earned her wages. On August 10, 1982, Schuster filed a petition in the Tax Court contesting

that determination. The Tax Court affirmed the Commissioner's decision. Schuster then brought this appeal.

On appeal, Schuster makes the following claims: (1) that the Tax Court erred by misstating the applicable principles of agency law, (2) that state law governs whether she should be treated as an agent of her Order, (3) that the Tax Court erred in adopting the Commissioner's "agency triangle" theory and his conclusion that the employee of one person cannot simultaneously be the agent of another person, and (4) that the Commissioner cannot reverse his previous position on the issue when Congress has acquiesced in it.

The Commissioner argues that the Tax Court correctly concluded that Schuster earned the wages in her individual capacity, relying heavily on the recent decision of the Court of Appeals for the Federal Circuit in *Fogarty v. United States*, 780 F.2d 1005 (Fed.Cir.1986).

## II.

Before discussing the agency issue, which is determinative of the outcome in this case, we must address the preliminary issue raised by Schuster: whether the Commissioner's agency theory is inconsistent with several published revenue rulings. Schuster argues that, in taking the position he does with respect to her tax status, the Commissioner is attempting to reverse a long-standing administrative position, despite congressional acquiescence in previous revenue rulings advancing that position.

■ While Schuster may be correct, we need not determine whether there has been or need be consistency among the Commissioner's positions on the issues presented in this case. The Supreme Court's decision in *Dickman v. Commissioner*, 465 U.S. 330, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984), fully authorizes the Commissioner to change his position on an issue, if he chooses to do so. *Id.* 104 S.Ct. at 1094. In *Dickman*, the Commissioner issued notices of gift tax deficiency to a taxpayer who had made interest-free loans. The taxpayer argued

that the Commissioner's position was a departure from prior Internal Revenue Service practice, because prior to 1966 the Commissioner had not construed the gift tax statutes and regulations to authorize the levying of a gift tax on the value of the use of the money. The Supreme Court dismissed the taxpayer's arguments, stating:

Even accepting the notion that the Commissioner's present position represents a departure from prior administrative practice, which is by no means certain, it is well established that the Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect. *E.g., Dixon v. United States*, 381 U.S. 68, 72–75 [85 S.Ct. 1301, 1304–06, 14 L.Ed.2d 223] (1965); *Automobile Club of Michigan v. Commissioner*, 353 U.S. 180, 183–184 [77 S.Ct. 707, 709–10, 1 L.Ed.2d 746] (1957). This rule applies even though a taxpayer may have relied to his detriment upon the Commissioner's prior position. *Dixon v. United States, supra*, at 73 [85 S.Ct. at 1304].

*Id.* (footnotes omitted). Thus, even assuming the Commissioner has changed his position in the present case regarding whether the wages earned by Schuster would be includable in her gross income, such a change is legally permissible.

## III.

Section 61(a)(1) of the Internal Revenue Code of 1954 reads: "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including compensation for services, including fees, commissions, and similar items." 26 U.S.C. § 61(a)(1) (1982). The fact that compensation for services is includable in gross income nonetheless leaves unsettled the issue of whose gross income is to include that compensation.

Schuster argues that her compensation is not includable in her gross income because she received compensation only as an agent acting on behalf of the Order. The Commissioner, on the other hand, argues that

Schuster earned the compensation in her individual capacity and that it must be included as a part of her gross income. Because the statute does not address the agency issue, we look elsewhere for guidance in resolving this question.

In *Fogarty v. United States*, 780 F.2d 1005 (Fed.Cir.1986), the court of appeals thoroughly addressed the issue of whether a member of a religious order, who is subject to a vow of poverty, earns income in an individual, rather than representative, capacity. *Id.* at 1012–13. In that case, the taxpayer, a Roman Catholic priest, accepted employment as an associate professor at the University of Virginia. He received paychecks from the University made payable to him individually. Under canon law of the Catholic Church, Fogarty was not entitled to keep the amounts earned as compensation; instead, the Order received Fogarty's paychecks and provided him with a living expense allowance.

After the IRS determined Fogarty was obligated to report the income as his own, he paid it and sought a refund. His refund claims were denied, and he brought suit in the United States Court of Claims. The court of claims granted summary judgment in favor of the government, from which judgment Fogarty appealed.

The Court of Appeals for the Federal Circuit affirmed the court of claims' decision, stating that the agency determination is a question of law subject to general rules of agency, to be resolved upon consideration of all the underlying facts. The *Fogarty* court cited six relevant factors in making this determination: 1) the degree of control exercised by the Order over the member; 2) ownership rights between the member and the Order; 3) the purposes or mission of the Order; 4) the type of work performed by the member vis-a-vis the purposes or mission; 5) the dealings between the member and the third-party employer, including the circumstances surrounding inquiries and interviews, and the control or supervision exercised by the employer; and 6) the dealings between the employer and the Order.

After applying these factors to the facts, the court concluded in *Fogarty* that the priest had earned the income in his individual capacity, and affirmed the tax court decision. We agree with the *Fogarty* court's conclusion that the agency determination requires a flexible test which allows consideration of all the relevant factors. Thus, we also adopt such a flexible test in this case requiring and directing a consideration of all the underlying facts.

In adopting this flexible test approach, we reject the so-called "agency triangle" theory relied upon by the Commissioner. Under the "agency triangle" theory, a finding that the income generated by an individual's personal services was actually earned on behalf of a separate and distinct principal is premised upon a preliminary finding that a contract or other express agreement existed between the payor of the income and the alleged principal, in which the alleged principal has expressly granted the payor the right to use the individual's services on the principal's behalf. Thus, the Commissioner argues, absent a contract between the Order and the NHSC, Schuster could not have earned compensation from the NHSC on behalf of the Order.

As support for this theory, the Commissioner cites *Johnson v. United States*, 698 F.2d 372 (9th Cir.1982). In *Johnson*, a professional athlete, who had conveyed the exclusive rights to his personal services to a corporation, contended that the corporation was taxable on amounts paid directly to it by his employer. The court, however, held that the player, and not the corporation, was to be taxed for the earnings. The court stated that, in order for the corporation to be taxed, two requirements must be met: 1) the corporation must have the right to control the player's services and to negotiate the player's compensation, and 2) the third-party employer must recognize the corporation's control over the player. Because the basketball teams employing the player refused to contract with the corporation, the court found that the second requirement had not been met and that the

earnings were properly taxable to the player.

In our view, the two-part test applied by the *Johnson* court and the "agency triangle" theory too narrowly restrict the inquiry into an alleged agency relationship. While the dealings between the third-party employer and the alleged principal are an important factor to be considered in assessing the agency determination, there are several other important factors. A flexible test, allowing consideration of all of those factors, better serves our analysis in attempting to determine whether income is to be taxed against the person or entity who actually earned it or against someone else.

## IV.

■ Applying the factors cited by the *Fogarty* court to the facts in the present case, we conclude that Schuster, like Fogarty, earned her wages in her individual capacity, rather than as an agent on behalf of her Order. This conclusion is supported, first, by examining the degree of control the Order exercised over Schuster. The Order required Schuster to take a vow of obedience, under which Schuster was obligated to subjugate her will to that of the Order. However, Schuster remained free to withdraw from the Order at any time. The Provincial Superior approved Schuster's acceptance of the job with the Clinic and Schuster's living expenses. The Order also approved Schuster's request to apply and interview for positions in health manpower shortage areas and her request to accept the position with the Clinic. While, pursuant to Schuster's vow of obedience, the Order retained authority to control Schuster's daily routine, the Order did not in fact exercise such day-to-day control.

Second, Schuster's entitlement to the compensation was clearly superior to the Order's. Schuster's paychecks were made payable to her individually. The fact that she endorsed the checks over to the Order before mailing them to the lockbox maintained by the Order in St. Louis demonstrates the superiority of her control over the wages. In addition, Schuster's receipt of personal benefit from employment perquisites, such as annual and sick leave, continuing professional education, and malpractice protection in return for her services provides further support for a conclusion that what Schuster earned, she earned individually.

The third and fourth factors cited by the *Fogarty* court are best considered together: the purpose of the Order and the type of work performed by the member in light of that purpose. The purposes of the Order, generally stated, were to undertake religious and charitable works that promote education and provide health care. Schuster's employment in providing health care services to patients of the Clinic was indisputably consistent with those purposes. Arguably, in these respects, Schuster was acting as an agent for the Order and not on her own behalf.

However, when the purpose of the Order and the work of the member are considered in light of the fifth and sixth factors suggested by the *Fogarty* court, the conclusion seems inescapable that Schuster was not acting merely as an agent of her Order. Factors five and six from *Fogarty* require an analysis of the dealings between the member, the Order, and the employer, and this analysis is very revealing.

Schuster filed an application for employment with the NHSC. Although she was willing to specify a salary level as a condition of her accepting employment with the NHSC, Schuster said nothing on her application about working as an agent on behalf of her Order. Schuster was interviewed over the telephone by a NHSC employee, but again there was no mention of any agency relationship. Schuster also traveled alone to the Clinic as a prospective NHSC assignee at the NHSC's expense. Then, when offered the job at the Clinic, Schuster wrote a letter dated July 1, 1979, to the NHSC confirming her acceptance. Schuster's employment was in no way conditioned upon her status as a member of the Order. Admittedly, the Acting Provincial Administrator of the Order also wrote a letter on July 1, 1979, which appears to

make an employment offer to the NHSC for Schuster's services. But, by Schuster's own admission, she had already accepted an offer on the date the Order's offer was made. All the contact between Schuster and the NHSC, especially as related to her acceptance of employment, which occurred without reference to or conditioned upon her alleged agency relationship with the Order, suggests that Schuster was not operating as an agent of the Order.

In addition, once employed, Schuster was under the direct supervision and control of the Clinic and the NHSC. In her daily tasks, Schuster was supervised by other Clinic employees. Schuster's performance was evaluated under the same employee appraisal system used by the Department of Health, Education and Welfare for other civil service employees. The Order was not supervising her work in a day-to-day sense, as evidenced by the fact that the Provincial Superior or another member of the Order's Placement Board made only periodic visits to the mission site. Though a person may, at times, act as an agent on behalf of two principals, the fact that day-to-day control over Schuster was exercised by the Clinic is, at least, consistent with the conclusion that, in performing her duties as an employee of the Clinic, she was acting on her own behalf.

The dealings between the NHSC, the Clinic, and the Order also evidence a conclusion that Schuster earned wages in her individual capacity. The first contact between the Order, the NHSC, and the Clinic was effected via the July 1, 1979 letters from the Acting Provincial Administrator of the Order to the NHSC and the Clinic. In these letters, Schuster's services were offered and a request was made that her wages be paid directly to the Order. The letters also expressly stated that Schuster's services "are performed ... on behalf of the Order as its agent." The NHSC did not respond to the letter it received. The Director of the Nurse-Midwifery Service at the Clinic sent a reply letter to the Order that, in addition to conveying a formal acceptance of the Order's offer, took exception with the procedure requested by the Order, directing instead that Schuster's checks would be made payable to her, making her free to endorse them over to the Order, if that was Schuster's choice. At most, there was no agreement regarding the manner in which the paychecks would be written. Moreover, when Schuster accepted payment for her services, she accepted it in the form of paychecks made out to her individually. Her failure to insist on direct payment to the Order further disputes her subsequent claim that she had earned her wages as an agent of the Order.

Upon consideration of all of these factors, we conclude that the decision of the tax court should be and is AFFIRMED.

CUDAHY, Circuit Judge, dissenting:

Although not cited, the majority opinion must necessarily rely ultimately upon *Lucas v. Earl*, 281 U.S. 111, 50 S.Ct. 241, 74 L.Ed. 731 (1930). That seminal opinion of the revered Oliver Wendell Holmes established the principle that income is taxable to the person who earns it—a principle that purportedly undergirds the analysis and result of the majority here. Justice Holmes held in *Lucas v. Earl* that an assignment of income by the income earner was not effective to shift the locus of tax liability. I am sure that Justice Holmes, keeping track of our work at his celestial *Lexis* terminal, is appalled to find his much-cited opinion invoked by the government and the Tax Court to extract taxes from a poverty-pledged nun doing corporal works of mercy[1] on behalf of a religious community.

The government seems indeed to have changed its policy on demanding taxes from members of religious orders who have taken a vow of poverty.[2] I do not

---

1. *See St. Matthew* 24:35–40.

2. O.D. 119, 1 C.B. 82 (1919) generally relieved members of religious orders, who had taken a vow of poverty, of tax liability for funds turned over to the order. Rev.Rul. 123, 1968–1 C.B. 35, concerning a nurse who was a member of a religious order and who received salary checks from a hospital that she endorsed over to the order, determined that the nurse received no

disagree with the majority that the government may under most circumstances change its administrative practice. *Cf. Dickman v. Commissioner*, 465 U.S. 330, 342–43, 104 S.Ct. 1086, 1093–93, 79 L.Ed.2d 343 (1984). But here the government has nowhere denied that its change of position was anything but a pusillanimous reaction to the antics of the tax protest movement. Abuse of the tax system by tax resisters, who occasionally have recourse to religious disguises, is no good reason for unfairly changing the rules at the expense of genuine members of religious orders who have taken solemn vows of poverty.

The majority has preferred form over substance and has elevated the minutiae of an employment arrangement over the underlying reality of a religious status having binding contractual force. As Judge Korner noted in the Tax Court on behalf of the seven dissenters there, "Petitioner clearly did not receive her paychecks under claim of right for herself, but only on behalf of, and as agent for, her Order, and she derived no personal benefit therefrom." 84 T.C. 764, 789 (1985).

The majority has, I think wisely, rejected the extreme "agency triangle" theory espoused by the government and swallowed whole by a majority of the Tax Court. The majority also purports to turn away from *Johnson v. United States*, 698 F.2d 372 (9th Cir.1982) as too inflexible. In fact, the majority's application of its own test looks somewhat like *Johnson*.

The majority ostensibly applies a "six-part" test derived from *Fogarty v. United States*, 780 F.2d 1005 (Fed.Cir.1986), which managed to establish the tax liability of a Jesuit priest, vowed to poverty, teaching at the University of Virginia, who endorsed his paychecks to his order in accordance with Roman Catholic cannon law and his own vows. *Fogarty* seems willing to concede, incidentally, that before the 1970's the Internal Revenue Service always treated income of members of religious orders as income to their orders. *See Fogarty*, 780 F.2d at 1011 n. 6. This state of affairs would tend to buttress the view, which the IRS certainly has not denied, that its apparent change of approach is simply a response to the tax protest movement. This is hardly a reason that I find worthy of our sympathetic indulgence.

In any event, the six factors that the Federal Circuit mentions in *Fogarty* (with a minimum of analysis) do not cut against the taxpayer in the case before us. For example, with respect to the first factor, the degree of control exercised by the Order over the member, the majority concedes that Schuster had taken a vow of obedience under which she "was obligated to subjugate her will to that of the Order." [3] But the majority suggests that this pervasive form of control was somehow vitiated because "Schuster remained free to withdraw from the Order at any time." [4] There is simply nothing in the record to suggest that withdrawal was even a remote possibility and even the government has not argued that this is a legitimate consideration in these circumstances. Presumably Sister Francine Schuster's solemn promise to God is as potent a constraint on her own conduct as would be some threat of legal sanctions. In any event, the possibility of Schuster's withdrawal is entirely irrelevant because the issue is whether there is *currently* an agency relationship, not whether that relationship could be ter-

income because she acted as the agent of the order. But in Rev.Rul. 290, 1977–2 C.B. 26, and thereafter, the Commissioner seems to have altered his position generally in a direction more consistent with the one he takes in the instant case. All these positions seem ultimately to rest on an "agency" rationale, but the result for members of religious orders, such as Schuster, appears to have shifted.

3. Sister Francine Schuster agreed, as a precondition to her admission to the Order, to "em-

brace the Father's will as it is expressed in the constitution [of the Order] and as it is mediated through those who exercise authority in our congregation."

4. Of course, dispensation from a Sister's vows is only granted if the application is approved by the Provincial Superior of the Order, by the General Superiors of the Order in Rome and by the authorities of the Roman Catholic Church. Tr. at 20–21.

minated sometime in the future. If Sister Francine did leave the Order, she would retain no reversionary or other interest in the wages that had been paid for her services.

The majority concedes that Schuster is totally subservient to the direction of her superiors in the Order, but erroneously thinks it significant that the Order apparently did not choose explicitly to regulate her "day-to-day" activities. I see no good reason to expect the Order to control the daily details of the agent's specialized employment. Rather, I think it pertinent to see whether the Order approved the particular employment in accordance with the Order's mission, whether the Order continues to supervise the employment to ensure consistency with the Order's mission and purposes and whether the Order retains a real potential for controlling the employment activities (even if exercise of this control might require the agent to quit).

The majority erroneously concludes, in discussing the second *Fogarty* factor—ownership rights as between the member and the Order—that Schuster's entitlement to compensation was "clearly superior" to the Order's. This is simply the traditional *Lucas v. Earl* approach, indiscriminately applied, and totally ignores the vows of poverty and obedience—not to mention Schuster's faithful observance of those vows. The Supreme Court has held that such vows create a binding and enforceable contract. *See Order of St. Benedict v. Steinhauser*, 234 U.S. 640, 34 S.Ct. 932, 58 L.Ed. 1512 (1914). There is no indication that *Lucas v. Earl* overruled *Steinhauser*. The fact that Schuster received certain "perquisites" like annual leave and malpractice protection proves nothing. She received these as an agent of her Order, not personally.

As to the third and fourth factors derived from *Fogarty*, the purposes or mission of the Order as it relates to the type of work performed by the member, the major-

ity concedes that these favor Schuster. Caring for the sick (or for poor mothers delivering babies) is a major purpose of the Order and was in fact the work that Schuster did on the Order's behalf.[5] Presumably she would have done the same work in the Order's own facility had there been one. These are corporal works of mercy that have been carried on by Christian religious orders from the beginning.

As to the fifth and sixth factors, the majority undertakes an analysis of the details of the dealings among the Order, the National Health Service Corps, the Clinic and Schuster. I agree with the dissent in the tax court that much of this analysis is irrelevant, or at least blown out of all proportion to the really significant underlying realities.

> The majority seems to be overwhelmed by the fact that petitioner was carried on the rolls as a Federal Government employee, was paid by a Federal Government check, and had all the protections and benefits that other Federal employees get, e.g., paid sick leave and vacations, retirement benefits and the like, all of which the majority discusses in great detail. . . .
>
> Why this relationship to the Federal Government is so important to the majority in deciding the case escapes me. Presumably, petitioner would have had some or comparable benefits if she had been employed in private industry. . . . The real question in the case is this: when compensation was paid to petitioner for her services at the clinic, did petitioner receive that paycheck under her own claim of right as a person who had independently contracted her services, or did petitioner receive such paycheck as the agent of the Order, under a preexisting and enforceable contract obligation to serve as such agent?

84 T.C. at 778–79 (Korner, J., dissenting).

That the NHSC would in general respond to Schuster in all of the bureaucratically

---

**5.** The purposes of the Order as expressed in its articles, included, *inter alia*, the "conduct of hospitals and institutions for the care and treatment of suffering humanity and to do all and everything necessary or convenient for the accomplishment of any purposes or objects and powers above mentioned or incidental thereto."

sanctioned ways for dealing with government employees is simply not significant. Government agencies can hardly be expected to modify the forms of their behavior no matter how different may be underlying changes in substance. The facts are simply that both NHSC and the Clinic knew that Schuster was a nun committed by solemn vows to strict obedience to her religious superiors as well as to abject poverty.[6] Both NHSC and the Clinic therefore knew who controlled her activities and who would actually receive any compensation paid with respect to her services. They hired her and paid her on that basis—namely as an agent of the Order. No more need have been shown.

I think a proper test for determining whether or not Schuster is employed and receives compensation as the agent of her Order would emphasize three factors. First, the question of the principal's right to direct or control the agent's activities in a meaningful way would be central. Here there is no question about the vow of obedience and the right to control. This very sweeping basis of control creates an agency relationship *now;* any prospect of Schuster's leaving the Order in the future is not before us and is irrelevant to the question we are required to answer.

On the issue of day-to-day control, the focus should be on the Order's close supervision in the approval of the employment and the actual potential for promptly ending an employment relationship that no longer accords with the Order's mission and purposes. Here the Order was intimately involved in negotiating for and approving Schuster's job. Further, the Order periodically visits each Sister at her mission site to be sure that her employment continues to be in accordance with the Order's purposes. Tr. at 24–25. In this connection, Schuster was directed by the Order to decline to perform work that conflicts with a moral precept observed by the Order. Tr. at 23. Schuster followed this directive, as evidenced by the fact that at one point she warned the Clinic that she could not dispense artificial contraceptives. Tr. at 52–53. The Order's directive apparently resulted in changing the way she did, or would have done, her work. Certainly, as to almost any phase of her work, the Order could cause Schuster to sever the employment relationship if it disapproved of the direction of the job—as it could and would cause other nuns to quit in like circumstances. Tr. at 24. Because this sort of control seems quite fundamental, I have difficulty in seeing what sort of day-to-day control the majority would require in addition.

Second, it is important that the principal have the right to claim and take possession of the compensation earned by the agent without question and without the possibility of any effective adverse claim. *Cf. Maryland Casualty Co. v. United States,* 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920). There is no doubt that this criterion is fulfilled here. Although the checks for compensation are payable nominally to Schuster,[7] she is under the obligation of vows both of poverty and obedience to endorse the checks forthwith to her principal, the religious community. Only by the most undiscriminating reliance on *Lucas v. Earl* can it be argued that Schuster ever has anything resembling control of the compensation at the expense of the Order. In

---

**6.** Besides the letters mentioned by the majority, Sister Francine's official government personnel folder contains a letter that states:

This is to certify that *SISTER MARY FRANCINE SCHUSTER,* SS # 479–46–6684 is a member in good standing of the Adorers of the Blood of Christ, a tax-exempt religious organization, and is, therefore, a member of a religious order under a vow of poverty; that as a member in good standing of the Adorers of the Blood of Christ, her services are performed as part of the duties required to be performed by the member for/or on behalf of the order as its agent; and that all salaries or grants received by her accrue to the abovementioned organization because of her vow of poverty.

Exhibit AV (App. B–420).

**7.** That an agent is nominally the payee of a check is certainly not a good reason to conclude that the payee's status as an agent has in some way been affected. *Cf.* 3 Am.Jur.2d *Agency* § 139 (1962).

*Order of St. Benedict v. Steinhauser,* 234 U.S. 640, 34 S.Ct. 932, the Supreme Court held that the traditional monastic vows create an enforceable property interest in the order. The decedent, a member of a teaching order who had taken vows of poverty, chastity and obedience, earned during his lifetime royalties and other emoluments which he failed to turn over to his order, as required. Upon his death, he left a valuable estate that his order claimed, and litigation ensued between the decedent's administrator and the order. The Supreme Court held that the vows made by the decedent for the benefit of his order were a condition of his admission to the order. Hence, when he was admitted, a binding and enforceable contract was created and, as a result, the order was the true owner of the assets of the estate. *Steinhauser* therefore teaches that here there was an enforceable contract between Schuster and the Order giving the Order valid title to the paychecks and placing her in the position of agent to receive them and transmit them to her community.

In this respect, this case is on all fours with *Poe v. Seaborn,* 282 U.S. 101, 51 S.Ct. 58, 75 L.Ed. 239 (1930), which was decided only eight months after *Lucas v. Earl.* In *Poe,* the Supreme Court held that the earnings of couples living in community property states must be reported one-half by each, irrespective of the fact that one spouse's work generated all the income of the marital community. The Court reasoned that, in a community property state, the income earner is the agent of the marital community, and "the earnings [of the husband] are never the property of the husband, but that of the [marital] community." *Poe v. Seaborn,* 282 U.S. at 117, 51 S.Ct. at 61. Similarly here under *Steinhauser* Schuster's earnings are never hers but are the property of the religious community for whom she is an agent. In *Poe* the husband became an agent for his wife when they married. In the case before us, Schuster became an agent of the Order for the purpose of furthering the Order's mission when she entered it and took her vows

of obedience and poverty. Thus there is nothing in the present facts to indicate that Schuster is ever in control of, or the owner of, or even the claimant of, the compensation and hence is not taxable on it.

The third criterion for determining whether the salary is taxable to the purported agent is whether the services performed are of a type within the mission or purpose of the alleged principal. Certainly here there is little doubt that Schuster, as a nurse-midwife for the poor, is performing a service squarely within one of the Order's principal and traditional purposes of rendering health care.[8] Here the Order authorized and directed one of its members to render nurse-midwife services at Su Clinica while on the payroll of NHSC. Under those circumstances the Order acted as principal in the arrangement with NHSC and the Clinic. The Order, had it possessed a facility like the Clinic, could have performed the same services more directly through Schuster still acting as its employee and agent. Merely because the Order acted by arrangement with NHSC and the Clinic should not result in taxable income to its agent, Schuster. The arrangements the Order and Schuster made here are simply the shifting to modern circumstances and a modern locale of the very services the Order apparently rendered from its inception. This is then merely a modern format for an ancient process.

Beside these three factors, there is little reason to give weight to the formal dealings between the member and the employer or the employer and the Order. These dealings were apparently given less weight even in *Fogarty* and are certainly secondary to those I have outlined above. While these ambiguous circumstances involving the dealings of the parties provide some evidence that an agency relationship did exist, these formalities are not necessary for such a relationship. If, as here, the employer—NHSC or the Clinic—knows of the unusual agency *in all its ramifications* and does not object but goes forward, it is without consequence that the employer

**8.** *See supra* note 5.

fails to alter its customary employment practices to formally and explicitly acknowledge the status of the principal.

Certainly in substance, if not wholly in form, Francine Schuster is the agent of her Order in rendering nurse-midwife services at the Clinic. Both in law and in economic reality the compensation with respect to her services is at all times the property of the Order and is treated as such. The object of *Lucas v. Earl* was to put obstacles in the path of tax avoidance not to deny economic reality. Therefore, the compensation should not be taxable to Schuster.

Hence, I respectfully dissent.