# United States Tax Court

T.C. Memo. 2025-7

SONJI MARIE MOSLEY,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 11872-22.                    Filed January 22, 2025.

————————

Sonji Marie Mosley, pro se.

*Xheni D. Gallagher*, *Timothy R. Prosky*, and *Olivia H. Rembach*, for respondent.

## MEMORANDUM OPINION

ASHFORD, *Judge*: The Internal Revenue Service (IRS or respondent) determined a deficiency in petitioner's federal income tax of $83,373 and additions to tax pursuant to sections 6651(a)(1) and (2)[1] and 6654 of $8,566, $7,424, and $1,071, respectively, for the 2018 taxable year. The issues for decision are whether for 2018 petitioner is (1) entitled to a net operating loss (NOL) carryforward deduction, (2) entitled to a capital loss carryforward deduction, (3) liable for the 10% additional tax imposed by section 72(t) on early distributions from

———

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. Some monetary amounts are rounded to the nearest dollar.

[*2] qualified retirement plans, and (4) liable for the additions to tax.[2] We resolve all issues in favor of respondent.

## *Background*

The parties submitted this case to the Court for decision without trial under Rule 122. The Court incorporates by reference the parties' Stipulation of Facts, the Supplemental Stipulation of Facts, and the attached Exhibits. Petitioner resided in North Carolina when she filed her Petition with the Court.

I.  *Petitioner's Real Estate Activities and Pre-2018 Tax Reporting of Those Activities*

In 2003 petitioner purchased four residential rental properties in North Carolina (North Carolina properties). In 2007 petitioner purchased land as a capital investment in Bluffton, South Carolina (South Carolina land). On various dates in 2009, however, the North Carolina properties and the South Carolina land were foreclosed on by lenders.

Petitioner did not report the tax implications of the foreclosures on the North Carolina properties on her 2009 federal income tax return. Instead, on that return (i.e., line 17—Rental real estate, royalties, partnerships, S corporations, trusts, etc.) and as detailed on Schedule E, Supplemental Income and Loss, attached that return, petitioner claimed loss deductions totaling $20,290 for various expenses incurred with respect to the properties during 2009. Additionally, on her 2014 and 2015 federal income tax returns (i.e., line 14—Other gains or (losses)) and as detailed on Forms 4797, Sales of Business Property, attached to those returns, petitioner claimed ordinary loss deductions of $17,064 and $28,770, respectively, from the sale or exchange of two of the North Carolina properties (one property in 2014 and the other property in 2015) despite the foreclosures on those properties in 2009. It was on her 2016 and 2017 federal income tax returns (i.e., line 21—Other income)

---

[2] The primary basis of the federal income tax deficiency determined against petitioner was that she had unreported income totaling $257,707, consisting of wages of $40,656, interest income of $180, and income from early distributions from two individual retirement accounts (IRAs) totaling $216,871. Pursuant to the Stipulation of Facts and on brief, petitioner agreed that she received the aforementioned unreported income. With respect to the deficiency, petitioner challenges only her right to offset that income by certain deductions and the imposition of the section 72(t) additional tax on the early IRA distributions.

[*3] that petitioner claimed an NOL carryforward deduction of $37,064 for each of those years.

With respect to the foreclosure on the South Carolina land, petitioner reported on Schedule D, Capital Gains and Losses, attached to her 2009 return, $182,343 of net long-term capital losses resulting from the foreclosure, and on that return (i.e., line 13—Capital gain or (loss)) she claimed $3,000 of that amount as a capital loss deduction pursuant to section 1211(b). On her federal income tax returns for 2010–17, petitioner carried forward the 2009 net long-term capital losses, claiming for each of those years a $3,000 capital loss deduction. Additionally, on her 2015 return and as detailed on Form 4797 attached to that return, petitioner claimed an ordinary loss deduction of $110,257 from the sale or exchange of the South Carolina land despite the foreclosure on that land in 2009.

## II. *Petitioner's 2018 Income*

During 2018 petitioner worked for the City of Charlotte, North Carolina. As a City of Charlotte employee petitioner had two IRAs: one with Prudential Insurance Co. of America (Prudential) and the other with the Local Governmental Employees Retirement System of NC (LGERS). During 2018, pursuant to withdrawal requests she made to Prudential and LGERS, petitioner received three distributions totaling $224,674. As of the close of that year, petitioner was under 59-1/2 years of age.

Prudential sent the IRS and petitioner Forms 1099–R, Distributions From Pensions, Annuities, Retirement or Profit-Sharing Plans, IRAs, Insurance Contracts, etc., for 2018, reflecting gross distributions of $9,003 and $119,820 as early distributions with "no known exception." Similarly, LGERS sent the IRS and petitioner a Form 1099–R, for 2018, reflecting a gross distribution of $95,851 as an early distribution with "no known exception." Each Form 1099–R also reflected a certain amount of federal income tax withheld. The Form 1099–R with respect to the $9,003 distribution further reflected that the distribution was a "designated Roth account distribution" and that the taxable amount of the distribution was $1,200.

## III. *Petitioner's 2018 Tax Reporting and the 2018 Notice of Deficiency*

Petitioner did not file a federal income tax return for 2018. Using the information on the Forms 1099–R from Prudential and LGERS, as well as other third-party information, the IRS prepared a substitute for

[*4] return for petitioner for 2018 pursuant to section 6020(b) (2018 SFR). The 2018 SFR included as income wages from the City of Charlotte, interest from the Local Government Federal Credit Union, and the IRA distributions; allowed a standard deduction for a single filer; and took into account the federal income tax withheld on the wages and the IRA distributions.

The IRS sent petitioner a notice based on the SFR, dated November 8, 2021, informing her that (1) the IRS had not received her 2018 return and (2) if she did not file it by December 8, 2021, the IRS would assess her proposed 2018 liability using single or married filing separate filing status and as a result she would not otherwise receive certain exemptions, deductions, or credits.[3] The notice outlined petitioner's proposed 2018 liability which, as of the date of the notice, totaled $59,699: (1) a proposed liability of $83,373; (2) payments she made (i.e., federal income tax withheld) of $45,301; (3) a "[f]ailure to file penalty" (i.e., the section 6651(a)(1) addition to tax) of $8,566; (4) a "[f]ailure to pay penalty" (i.e., the section 6651(a)(2) addition to tax) of $6,282; (5) a "[f]ailure to pay proper estimated tax" (i.e., the section 6654 addition to tax) of $1,071; and (6) statutory "[i]nterest charges" of $5,707. The proposed liability included an additional $21,687 in income tax that petitioner owed on early distributions from IRAs and other retirement plans under section 72(t).

In response petitioner did not file her 2018 return but instead sent the IRS a letter dated December 7, 2021, stating that the letter was to serve as a "formal written protest of [the] tax, penalties, and interest assessed." To that end, although therein she admitted to the unreported income and the taxability of that income (including the section 72(t) additional tax), she calculated that she had a "credit" of $6,514 because she had capital loss carryovers totaling $162,664 "or more" from prior years' federal income tax returns that the IRS had not taken into account. She also requested that all additions to tax and interest be abated.

On March 7, 2022, the IRS issued a Notice of Deficiency to petitioner based on the 2018 SFR, determining that she (1) had unreported income totaling $257,707 from wages ($40,656), interest

---

[3] We note that the IRS apparently first informed her by notice dated December 23, 2019, that it had not received her 2018 return. In response petitioner sent the IRS a handwritten letter dated January 20, 2020, stating that her Social Security number had been compromised, as she had been a "victim of gang stalking . . . for almost 4 years through cyber technologies."

**[\*5]** ($180), and early IRA distributions ($216,871); (2) was liable for the section 72(t) additional tax on the early IRA distributions; (3) was liable for an income tax deficiency of $83,373; and (4) was liable for additions to tax under sections 6651(a)(1) and (2) and 6654 of $8,566, $7,424, and $1,071, respectively.[4] On May 19, 2022, petitioner timely petitioned this Court for redetermination of the deficiency and the additions to tax.

IV.    *Tax Court Proceedings*

Approximately five months before the parties submitted this case to the Court for decision without trial under Rule 122, petitioner submitted to respondent's counsel a handwritten updated calculation of her 2018 tax liability. As relevant here, in this updated calculation she still acknowledged receipt of the unreported income totaling $257,707, and still asserted that she had a capital loss carryover deduction of $162,664 and that all additions to tax and interest should be abated, but she also asserted that the section 72(t) additional tax was prepaid with the result that she did not owe any additional tax and had a "credit" of $26,400.

The record also includes four undated, one-page documents that petitioner prepared and provided to respondent's counsel. The first document, titled "Net Operating Losses (NOLs) & Capital Losses–Sonji M. Mosley 2018 1040 Return," was a summary schedule of petitioner's proposed NOLs and capital losses. Therein she indicated that an NOL had been generated in 2009 of $444,600, which she carried forward for 2014–17 (using $17,064, $139,027, $37,064, and $37,064 for those respective years), with the result that for 2018 she had an NOL "[b]eginning [b]alance" of $214,381. In this document she also indicated that a capital loss had been generated in 2009 of $206,494, which she carried forward for 2010–14, 2016, and 2017 (using $3,000 for 2010–14 and 2017, and $1,679 for 2016), with the result that for 2018 she had a capital loss "[b]eginning [b]alance" of $186,815. Additionally, in this document she indicated a "Cap Gain Generated" in 2009 of $189,888.

The second document, titled "2018 1040 Summary of Net Operating & Capital Losses—Sonji M. Mosley," was petitioner's writeup explaining how the 2009 NOL of $444,600 and a 2009 capital loss of $182,344 (as opposed to $206,494 as reflected on the first document) had been generated. To that end, she stated therein that the former was due to the foreclosures on the North Carolina properties that had cost bases

---

[4] Statutory interest of $6,487 was also determined in the Notice of Deficiency.

[*6] of $120,000, $117,000, $105,200, and $102,400; and the latter was due to the foreclosure on the South Carolina land that had a $206,494 cost basis, taking into account (as a subtraction) a downpayment of $19,950 and $4,200 in closing costs.

The third document, titled "2018 Capital Loss Schedule—Sonji Mosley," was a summary schedule detailing how each 2009 foreclosure generated either a capital gain or loss. To that end, with respect to the South Carolina land, petitioner indicated that (1) the original purchase price in 2007 was $182,344; (2) the downpayment and closing costs totaled $24,150; (3) there was no accumulated depreciation; (4) its adjusted basis in 2009 was $206,494; (5) the outstanding mortgage in 2009 was $72,087; (6) the fair market value in 2009 was $340,000; and (7) the foreclosure generated a capital gain of $267,913. With respect to the North Carolina properties, petitioner indicated that (1) the original purchase prices were $120,000, $117,000, $105,200, and $102,400; (2) there were no downpayment and closing costs; (3) there was no accumulated depreciation; (4) their adjusted bases in 2009 were the same as their original purchase prices; (5) the outstanding mortgages in 2009 were $114,351, $112,000, $106,587, and $106,597; (6) the fair market values in 2009 were $96,900, $94,000, $85,300, and $85,300; and (7) the foreclosures generated capital losses of $17,451, $18,000, $21,287, and $21,287, for a combined "[C]apital Loss" of $78,025. Additionally, petitioner indicated therein that a net capital gain of $189,888 (as similarly reflected in the first document) had been generated with respect to the five foreclosures ($267,913 – $78,025).

The fourth document, titled "2018 Tax Year Assessment Calculation Adjustment (Sonji Marie Mosley, Primary SSN#)," was a further updated calculation of petitioner's 2018 tax liability. As relevant here, in this further updated calculation she still acknowledged receipt of the unreported income totaling $257,707 and still asserted that all additions to tax and interest should be abated; but she also asserted that the IRA distributions were "penalty free withdrawals" and that her NOLs totaled $211,308 ($214,381 (i.e., her 2018 NOL "[b]eginning [b]alance as reflected on the first document) − $3,073) with the result that she had a "credit" of $39,226.

Using petitioner's handwritten updated calculation and the additional documents she provided, information from public records, IRS-created amortization and depreciation schedules, and IRS internal reports, respondent prepared a summary schedule calculating petitioner's NOLs and long-term capital losses from the 2009

**[*7]** foreclosures on the North Carolina properties and the South Carolina land. These calculations indicate that the foreclosures on the North Carolina properties resulted in a net gain to petitioner totaling $55,576 and the foreclosure on the South Carolina land resulted in a long-term capital loss of $135,113.

*Discussion*

I.    *Burden of Proof*

In general, the Commissioner's determinations set forth in a Notice of Deficiency are presumed correct, and the taxpayer bears the burden of proving otherwise. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Tax deductions are a matter of legislative grace, and the taxpayer bears the burden of proving entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992); *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). This burden requires the taxpayer to demonstrate that the claimed deductions are allowable pursuant to some statutory provision and to substantiate the expenses giving rise to the claimed deductions by maintaining and producing adequate records that enable the Commissioner to determine the taxpayer's correct liability. § 6001; *Higbee v. Commissioner*, 116 T.C. 438, 440 (2001). In the case of an NOL deduction, this burden requires the taxpayer to substantiate the NOL deduction by establishing both the existence of the NOL and the amount that may be carried over to the year in question. *United States v. Olympic Radio & Television, Inc.*, 349 U.S. 232, 235 (1955); *Keith v. Commissioner*, 115 T.C. 605, 621 (2000). Similarly, in the case of a capital loss deduction that is carried over from one year to another, this burden requires the taxpayer to substantiate the capital loss deduction by establishing that the loss was incurred; when the loss was incurred; that the taxpayer is entitled to deduct the loss; whether the loss is capital or noncapital, or business or personal; and the amount of capital gain during the intervening years.[5] *Cherizol v. Commissioner*, T.C. Memo. 2014-119, at *21 (and cases cited thereat).

---

[5] We note, and as we observed *supra* note 2, that this case originated primarily as an unreported income case. In an unreported income case, the IRS must provide some reasonable foundation connecting the taxpayer with the income-producing activity. *See Williams v. Commissioner,* 999 F.2d 760, 763–64 (4th Cir. 1993), *aff'g* T.C. Memo. 1992-153; *Weimerskirch v. Commissioner*, 596 F.2d 358, 360 (9th Cir.1979), *rev'g* 67 T.C. 672 (1977). Once the IRS has produced evidence linking the

**[\*8]** Additionally, the burden of production remains on the taxpayer with respect to the additional tax under section 72(t).[6] *See El v. Commissioner*, 144 T.C. 140, 148 (2015) (citing *Ross v. Commissioner*, T.C. Memo. 1995-599, 1995 Tax Ct. Memo LEXIS 597, at \*16–20).

The Commissioner bears the burden of production with respect to the additions to tax under sections 6651 and 6654, *see* § 7491(c), but the taxpayer bears the burden of proving that the Commissioner's determinations with respect to the additions to tax should not be sustained, *see Wheeler v. Commissioner*, 127 T.C. 200, 207 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

II.  *NOL Carryforward Deduction*

For 2018, section 172(a) allowed a deduction equal to the sum of the taxpayer's NOL carryovers and NOL carrybacks to the taxable year.[7] An unused NOL was (and is) generally required to "be carried to the earliest of the taxable years to which . . . such loss may be carried." § 172(b)(2).  For NOLs arising in taxable years ending on or before December 31, 2017 (as alleged here), the period to which NOLs could be carried generally extended 2 years back and up to 20 years forward. § 172(b)(1)(A).  A taxpayer could elect to relinquish the carryback period, but only if he or she made such an election by the due date for filing a return for the year in which the NOL arose.  § 172(b)(3).  Tax returns for prior years may be necessary to establish an NOL carryforward, *see* § 172(b)(2) and (3), but the returns themselves cannot substantiate, without other evidence, the losses reported on those returns, *McRae v. Commissioner*, T.C. Memo. 2019-163, at \*24 (and cases cited threat).

---

taxpayer with an income-producing activity, the burden of proof shifts to the taxpayer to prove by a preponderance of the evidence that the IRS's determination is arbitrary or erroneous. *Helvering v. Taylor*, 293 U.S. 507, 515 (1935).  Similarly, under section 6201(d), if a taxpayer in any court proceeding asserts a reasonable dispute with respect to any item of income reported on an information return and has fully cooperated with the IRS, the IRS shall have the burden of producing reasonable and probative information concerning the deficiency, in addition to the information return.  We sustain the IRS's determination of unreported income because petitioner agrees that she received this income.

[6] Petitioner does not otherwise contend that the burden of proof should shift to respondent under section 7491(a) as to any relevant issue of fact, nor has she established that she has met the requirements for shifting the burden of proof.

[7] The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13302(a), (b), (e), 131 Stat. 2054, 2121–23, made amendments to section 172 that have no application here.

**[\*9]**   The parties do not dispute that the North Carolina properties were foreclosed on by lenders in 2009. However, petitioner did not report the tax implications of the foreclosures on her 2009 return. Indeed, petitioner did not report having incurred any NOLs on her 2009 return; instead, she claimed Schedule E loss deductions totaling $20,290 on that return for various expenses incurred with respect to the properties during 2009. Furthermore, because petitioner did not report having incurred any NOLs on her 2009 return, she did not make an election to relinquish the carryback period as required under section 172(b)(3).

Nevertheless, despite the foreclosures on the North Carolina properties in 2009, petitioner reported on her 2014 and 2015 returns that she had sold two of the properties (one property in 2014 and the other property in 2015) and improperly claimed ordinary loss deductions of $17,064 and $28,770, respectively.[8] Additionally, separate and apart from erroneously reporting these sales several years after the year the properties were foreclosed on, petitioner indicated on the one hand in two undated, one-page documents she prepared and provided to respondent's counsel after filing her Petition that the foreclosures on the North Carolina properties had generated an NOL of $444,600 (and this amount was based solely on the cost bases of the properties), and on the other hand in a third undated, one-page document she prepared and provided to respondent's counsel after filing her Petition that the foreclosures on the North Carolina properties had generated a combined "[C]apital Loss" of $78,025. For his own part, respondent prepared a summary schedule based on the documents petitioner provided, public records, IRS-created amortization and depreciation schedules, and IRS internal reports, and that schedule indicates that the foreclosures on the North Carolina properties did not result in a $444,600 NOL (or a $78,025 capital loss), but rather a net gain of $55,576.

It is apparent that the record is devoid of evidence to properly establish both the existence and the amount of petitioner's NOLs in 2009. Furthermore, as noted above, petitioner did not make a timely election to relinquish the NOL carryback period (and consequently did not carry back any NOLs to the prior years as required by law).

---

[8] On the 2015 return she claimed an ordinary loss deduction totaling $139,027 which, in addition to including the $28,770 amount, included $110,257 for having sold the South Carolina land despite the foreclosure on that land also in 2009.

**[\*10]** Accordingly, petitioner is not entitled to an NOL carryover deduction in any amount for 2018.

III.    *Capital Loss Carryforward Deduction*

Section 165(a) generally permits a deduction for a loss sustained during the taxable year and not compensated for by insurance or otherwise.  However, a loss from the sale or exchange of a capital asset is allowed as a deduction only to the extent permitted under sections 1211 and 1212.  § 165(f).  Subject to the limitations of section 1211(b), taxpayers can carry forward their capital loss to succeeding taxable years.  § 1212(b).  Pursuant to section 1211(b), noncorporate taxpayers such as petitioner are permitted to deduct a loss on the sale or exchange of a capital asset to the extent of the gain from such a sale or exchange, plus the lower of (1) $3,000 ($1,500 in the case of a married individual filing separately) or (2) the excess of the loss over the gain.

As reflected on Schedule D attached to her 2009 return, petitioner initially reported that the foreclosure on the South Carolina land resulted in $182,343 of net long-term capital losses, and for each of 2009–17, she claimed $3,000 of that amount as a long-term capital loss deduction pursuant to section 1211(b).  But on the 2015 return, and as detailed on Form 4797 attached to that return, petitioner also improperly claimed an ordinary loss deduction of $110,257 from the sale or exchange of the South Carolina land despite the foreclosure on that land in 2009.  Thus, petitioner effectively double counted the loss from the foreclosure on the South Carolina land for 2015 and had deducted a total of $137,257 with respect to the South Carolina land for 2009–17.

For his own part, the summary schedule that respondent separately prepared indicates that the foreclosure on the South Carolina land resulted in a long-term capital loss of $135,113.  To be sure, had this $135,113 loss been reported and claimed correctly, petitioner might have been entitled to a long-term capital loss deduction of $3,000 for 2018 pursuant to section 1211(b).  However, because she reported the loss as a long-term capital loss for 2009–17 *and* as an ordinary loss for 2015, she is not entitled to claim any additional loss deduction for 2018.[9]

---

[9] Indeed, despite these return positions, petitioner indicated in two undated, one-page documents she prepared and provided to respondent's counsel after filing her Petition that a $189,888 net capital gain had been generated in 2009.

**[\*11]** On the record before us, it is apparent that petitioner is not entitled to a capital loss carryforward deduction for 2018.

IV.    *Additional Tax Under Section 72(t)*

Section 72(t) imposes a 10% additional tax on early distributions from qualified retirement plans (as defined in section 4974(c)).  *See* § 72(t)(1).  The 10% additional tax, however, does not apply to certain enumerated distributions.  *See* § 72(t)(2).  The only potential exception applicable here is the exception under section 72(t)(2)(A), which provides for distributions which are "made on or after the date on which the employee attains age 59-1/2."

Petitioner is liable for the section 72(t) additional tax for 2018.  The record establishes that petitioner had two IRAs through her employment with the City of Charlotte—one with Prudential and the other with LGERS—both of which were qualified retirement plans (they were North Carolina section 401(k) plans), and that petitioner received two distributions from Prudential and one distribution from LGERS in 2018.  The parties have also stipulated that the distributions were early distributions because petitioner had not attained the age of 59-1/2 when she received the distributions; thus, the section 72(t)(2)(A) exception does not apply.  Additionally, on brief, petitioner makes no principled defense as to the imposition of the section 72(t) additional tax on the distributions.  Accordingly, we sustain the IRS's determination in this regard.

V.    *Additions to Tax*

A.    *Failure to File*

Section 6651(a)(1) authorizes the imposition of an addition to tax for failure to timely file a federal income tax return unless the taxpayer shows that the failure was due to reasonable cause and not due to willful neglect.  *United States v. Boyle*, 469 U.S. 241, 245 (1985).

The record establishes that no federal income tax return was filed in petitioner's name for 2018 (other than the 2018 SFR) as the parties have stipulated that petitioner did not file a federal income tax return for that year.  Respondent thereby satisfies his burden of production under section 7491(c).[10]

---

[10] Under section 6651(g)(1), any return prepared under section 6020(b) is disregarded for purposes of section 6651(a)(1).

[*12] On brief, petitioner requests "abatement [of the section 6651(a)(1) addition to tax for 2018] as a reprieve based on meeting the filing requirements for previous tax years" and because "she was experiencing extreme difficulties during that year and currently." Petitioner also requests that the Court consider letters she received from the IRS dated August 1 and 15, 2023, related to abatement of the premature assessment of her 2018 deficiency. Petitioner's requests, however, are either meritless or irrelevant.

Regarding petitioner's former request, we note that each tax year stands alone, so the fact that she satisfied her filing requirements for years before 2018 is of no import. *See Dickman v. Commissioner*, 465 U.S. 330 (1984); *Dixon v. United States*, 381 U.S. 68, 72–75 (1965); *Auto. Club of Mich. v. Commissioner*, 353 U.S. 180, 183–84 (1957); *Schuster v. Commissioner*, 800 F.2d 672, 676 (7th Cir. 1986), *aff'g* 84 T.C. 764 (1985); *see also ATL & Sons Holdings, Inc. v. Commissioner*, 152 T.C. 138, 147 (2019) (citing *United States v. Skelly Oil Co.*, 394 U.S. 678, 684 (1969)); *Pekar v. Commissioner*, 113 T.C. 158, 166 (1999) (and cases cited thereat). Furthermore, petitioner has had multiple opportunities to file her 2018 return and still has not done so. As for her statement that she was "experiencing extreme difficulties" during 2018 and is currently experiencing such difficulties, we note that statements in a party's briefs are not part of the evidentiary record. *See* Rule 143(c) ("[S]tatements in briefs . . . do not constitute evidence."); *see also Ashkouri v. Commissioner*, T.C. Memo. 2019-95. While we are sympathetic to petitioner's alleged situation, a taxpayer's selective inability to perform her tax obligations while performing her regular business and personal activities does not excuse her failure to file. *See Godwin v. Commissioner*, T.C. Memo. 2003-289, slip op. at 22–23.

As for petitioner's latter request, we note that the August 2023 IRS letters merely acknowledge that the IRS had prematurely assessed petitioner's 2018 deficiency and that petitioner's account had been adjusted correspondingly; the letters have no substantive merit in this case. Accordingly, we find that petitioner is liable for the addition to tax under section 6651(a)(1).

B.    *Failure to Pay*

Section 6651(a)(2) authorizes the imposition of an addition to tax for failure to timely pay the amount shown as tax on a federal income tax return unless the taxpayer shows that the failure was due to reasonable cause and not due to willful neglect. In this regard, the

**[\*13]** Commissioner's burden of production under section 7491(c) requires him to come forward with sufficient evidence that the tax was shown on a federal income tax return and was not paid. *See Wheeler*, 127 T.C. at 210; *Worsham v. Commissioner*, T.C. Memo. 2012-219, slip op. at 21–22, *aff'd*, 531 F. App'x 310 (4th Cir. 2013).

In a case such as this where the taxpayer has not filed a federal income tax return for the taxable year at issue, a substitute for return prepared by the Commissioner that meets the requirements of section 6020(b) is treated as the "return" filed by the taxpayer for purposes of section 6651(a)(2). § 6651(g)(2); *see Wheeler*, 127 T.C. at 208–09. To constitute a valid section 6020(b) substitute for return, "the return must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'." *Rader v. Commissioner*, 143 T.C. 376, 382 (2014) (quoting *Spurlock v. Commissioner*, T.C. Memo. 2003-124, slip op. at 27), *aff'd in part, appeal dismissed in part*, 616 F. App'x 391 (10th Cir. 2015); *see also Ashford v. Commissioner*, T.C. Memo. 2022-101, at \*8, *aff'd*, Nos. 22-2307, et al., 2023 U.S. App. LEXIS 19297 (4th Cir. July 27, 2023); Treas. Reg. § 301.6020-1(b)(2).

The record establishes that the IRS prepared such a return for petitioner for 2018, and her arguments regarding her failure to pay are the same as her arguments regarding her failure to file, which we have rejected above. Accordingly, we find that petitioner is liable for the addition to tax under section 6651(a)(2).[11]

C.    *Failure to Pay Estimated Tax*

Section 6654(a) imposes an addition to tax "in the case of any underpayment of estimated tax by an individual." The addition to tax is calculated with reference to four required installment payments of the individual's estimated tax liability. § 6654(c) and (d). Each required installment payment is equal to 25% of the "required annual payment," which in turn is equal to the lesser of (1) 90% of the tax shown on the individual's return for that year (or, if no return is filed, 90% of the individual's tax for such year) or (2) if the individual filed a return for the preceding taxable year, 100% of the tax shown on the individual's return for the preceding taxable year. § 6654(d)(1)(A) and (B). For purposes of section 6654, an individual's tax consists of income tax and

---

[11] We note, however, that the application of the additions to tax under section 6651(a)(1) and (2) is limited as provided in section 6651(c).

14

**[\*14]** self-employment tax and is determined before the application of any wage withholding credit (but after the application of other allowable credits). *See* § 6654(f). For the year (or years) for which the section 6654 addition to tax is asserted, the Commissioner's burden of production under section 7491(c) requires him to produce evidence that the taxpayer had a "required annual payment," and in order to do so, he must establish the tax shown on the taxpayer's return for the previous year or that the taxpayer filed no such return. *Wheeler*, 127 T.C. at 212; *Schlussel v. Commissioner*, T.C. Memo. 2013-185.

Respondent met his burden of production because the record establishes that petitioner filed a federal income tax return for 2017, the "preceding tax year," with tax shown on that return and that she failed to make any federal tax payments for 2018 (aside from having withholding on her wages and the IRA distributions). Unlike the section 6651 addition to tax, the section 6654 addition to tax "has no provision relating to reasonable cause and lack of willful neglect. It is mandatory and extenuating circumstances are irrelevant" unless the taxpayer can show that one of several exceptions in section 6654(e) applies. *Grosshandler v. Commissioner*, 75 T.C. 1, 20–21 (1980) (quoting *Estate of Ruben v. Commissioner*, 33 T.C. 1071, 1072 (1960)). Petitioner has not argued that any of the statutory exceptions under section 6654(e) applies, and none apply. Accordingly, we find that petitioner is liable for the addition to tax under section 6654(a).

We have considered all of the arguments made by the parties and, to the extent they are not addressed herein, we find them to be moot, irrelevant, or without merit.

To reflect the foregoing,

*Decision will be entered for respondent.*